Ralph W. KEITH et al., Plaintiffs,

v.

John A. VOLPE, as Secretary of Transportation et al., Defendants.

Civ. No. 72–355–HP.

United States District Court,
C. D. California.

March 31, 1980.

John R. Phillips, Carlyle W. Hall, Jr., Jan G. Levine, Alletta d'A. Belin, Timothy B. Flynn, A. Thomas Hunt, Center for Law in the Public Interest, Los Angeles, Cal., for plaintiffs.

Richard G. Rypinski, Chief Counsel, Sacramento, Cal., Joseph A. Montoya, Robert W. Vidor, Ellen D. Tiger, Los Angeles, Cal., for State defendants.

Andrea Sheridan Ordin, U. S. Atty., Michael E. Wolfson, Asst. U. S. Atty., Los Angeles, Cal., for Federal defendants.

Kenneth L. Nelson, City Atty., City of Hawthorne, Hawthorne, Cal., for party plaintiff City of Hawthorne.

Royal M. Sorensen, Burke, Williams & Sorensen, Los Angeles, Cal., for intervenor City of South Gate.

MEMORANDUM AND ORDER GRANTING PLAINTIFFS' COUNSEL REASONABLE ATTORNEYS' FEES AND REIMBURSEMENT FOR CERTAIN COSTS AND EXPENSES

PREGERSON, Circuit Judge, by designation.

This matter is before the court on plaintiffs' application for an award of reasonable attorneys' fees and reimbursement for certain costs and expenses.

This environmental protection and civil rights suit was filed in February 1972 by persons living in the path of the proposed Century Freeway, and by the N.A.A.C.P., Sierra Club, Environmental Defense Fund, City of Hawthorne, and others. Plaintiffs, among other things, asked the court to halt

work on the proposed Century Freeway project, which would have displaced about 21,000 persons, until governmental officials complied with the following: federal and state statutes enacted to protect the human environment; federal statutes enacted to protect homeowners, tenants, and businesses forced to relocate; and federal statutes enacted to secure public participation in the decision making process through public hearings. Evidence presented to the court in May 1973, during hearings on plaintiffs' motion for a preliminary injunction, revealed that governmental officials had given little consideration to the freeway's effects on noise and air pollution. Evidence further disclosed a number of deficiencies in the relocation studies on the availability of "decent, safe, and sanitary housing" required by 42 U.S.C. § 4623(a)(1)(A). The severest housing shortage was in the Watts-Willowbrook area. In July 1972, to vindicate important national and state policies, the court issued a preliminary injunction halting further work on the proposed project until federal officials complied with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (NEPA), and until state officials complied with the California Environmental Quality Act of 1970, Cal.Pub.Res.Code § 21000 et seq. (CEQA). In addition, the court's order required that governmental officials hold additional public hearings, conduct further housing availability studies, and give satisfactory assurances that adequate replacement housing would be available as required by the Federal-Aid Highway Act of 1968, 23 U.S.C. § 101 et seq., and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq. Keith v. Volpe, 352 F.Supp. 1324 (C.D.Cal. 1972), aff'd en banc sub nom. Keith v. California Highway Commission, 506 F.2d 696 (9th Cir. 1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

The environmental impact statement, required by NEPA, which took public officials five years to prepare, was approved in October 1978 by the Secretary of the United States Department of Transportation. A year later, in October 1979, this court approved a Final Consent Decree setting forth a complex, but innovative settlement that promises to benefit the entire Southern California community for many years to come.

These benefits include a freeway designed to minimize noise and air pollution; special lanes designed for carpools; a transitway, designed for fixed rail or bus service, which will include passenger stations and park-and-ride facilities tying in with a similar project to be added to the Harbor Freeway; a massive low-income housing program which will provide 4,200 decent, safe, and sanitary dwelling units for displaced residents; and an affirmative action employment and job-training program to insure that minorities, women, and residents of the corridor get a fair share of the 20,000 jobs created by the project. It is estimated that, the entire project will cost close to $1.5 billion and will take about ten years to complete.

This fee application was filed pursuant to the Final Consent Decree, in which the state defendant agreed, in Paragraph IX, to pay within a reasonable time any fee award ordered by the court. The state, however, reserved the right to challenge both the plaintiffs' entitlement to an award as well as the reasonableness of the amounts requested.[1]

Having considered the briefs, affidavits, and exhibits submitted by counsel, the court concludes that plaintiffs' counsel are entitled to an award of reasonable attorneys' fees of $2,204,534.99 and reimbursement for certain costs and expenses of $24,778.12.

## I. ENTITLEMENT TO A FEE AWARD

Plaintiffs advance three theories in support of their claim for an award of attorneys' fees against the state: the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988; the common fund/com-

---

1. For convenience, the court frequently refers to the state defendant as either the state or defendant.

mon benefit doctrine; and the private attorney general doctrine recently codified in Cal.Civ.Proc.Code § 1021.5, effective January 1, 1978. The state defendant raises a number of objections to each of plaintiffs' theories. The court rejects the state's arguments and holds that plaintiffs' counsel are entitled to a fee award under the terms of 42 U.S.C. § 1988 and under the equitable common fund/common benefit doctrine.[2]

### Civil Rights Attorney's Fees Awards Act of 1976

Pursuant to 42 U.S.C. § 1983, plaintiffs assert two civil rights causes of action in their complaint. The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides in pertinent part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title . . ., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The state defendant, relying on *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), contends that the Eleventh Amendment prohibits an award of attorneys' fees to be paid out of the state's treasury. The Supreme Court in *Edelman* did hold that the Eleventh Amendment generally bars a federal court from awarding compensatory relief to be paid out of a state's treasury. *Edelman*, however, is not dispositive of this issue. In a recent decision, *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court ruled that Congress may, in the exercise of its enforcement power under § 5 of the Fourteenth Amendment, authorize an award of attorneys' fees against a state without violating the Eleventh Amendment. Defendant points out, however, that in *Hutto* the Supreme Court expressly vindicated the constitutional claim asserted under § 1983 whereas in the instant case, this court confined its analysis to the statutory issues asserted against the

state. Accordingly, defendant argues that Congress's power under the Fourteenth Amendment to override the state's immunity embodied in the Eleventh Amendment extends only to suits in which a party prevails on a constitutional claim.

Defendant's argument is without merit. In *Gagne v. Maher*, 594 F.2d 336 (2d Cir. 1979), *cert. granted*, 444 U.S. 824, 100 S.Ct. 44, 62 L.Ed.2d 30 (1979), the Second Circuit recently rejected the same argument:

> We think it is within Congress' Fourteenth Amendment power to authorize a fee award when a party prevails on a statutory claim as long as the pendent constitutional claim is a substantial one and arises out of the same operative facts. Such a fee award furthers the Congressional goal of encouraging suits to vindicate constitutional rights without undermining the longstanding judicial policy of avoiding unnecessary decision of important constitutional issues. As we understand the Supreme Court decisions, any appropriate means of implementing the Fourteenth Amendment overrides the State's Eleventh Amendment rights [citations omitted]. We hold that the authorization of attorneys' fees to be awarded under the standards set forth above is an appropriate way to achieve the competing goals described above.

*Id.* at 342–43. In *Bond v. Stanton*, 555 F.2d 172, 174–75 (7th Cir. 1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), the Seventh Circuit reached a result identical to that reached by the Second Circuit in *Gagne v. Maher*. *Accord, Southeast Legal Defense Group v. Adams*, 436 F.Supp. 891, 893–95 (D.Or.1977), *appeals docketed*, No. 78–2442, et al. (9th Cir. July 6, 1978).

This court finds the reasoning of the Second and Seventh Circuits to be persuasive. Civil rights plaintiffs, who, more often than not, bear the heavy burdens that accompany poverty and minority status in our society, should be encouraged to use the

---

**2.** Because the court finds that plaintiffs are entitled to an award of attorneys' fees under these two doctrines, it is unnecessary to rule on

the question whether the private attorney general doctrine authorizes an award of fees for plaintiffs' pendent state claims.

federal courts to avail themselves of the promise of equality that abides in the Constitution. To deny Congress the power to authorize an award of attorneys' fees where, as here, the court adhered to the longstanding judicial policy of avoiding unnecessary decision of important constitutional issues, would attach controlling weight to the particular claim—constitutional or statutory—upon which relief was granted. Accordingly, this court concludes that under § 5 of the Fourteenth Amendment Congress has the power to authorize an award of attorneys' fees against the state where the court's ruling is restricted to the statutory claims, and does not address the constitutional claims, asserted by plaintiffs.

Defendant next contends that since the court never expressly ruled on the plaintiffs' causes of action under 42 U.S.C. § 1983, plaintiffs cannot be considered as the "prevailing party" within the meaning of § 1988 and, therefore, are not entitled to attorneys' fees.

■ An award of attorneys' fees is proper even though this court never reached the merits of the § 1983 claim. *Kimbrough v. Arkansas Activities Ass'n.*, 574 F.2d 423, 426–27 (8th Cir. 1978); *Burchett v. Bower*, 470 F.Supp. 1170, 1172 (D.Ariz.1979). See also *Tongol v. Usery*, 601 F.2d 1091, 1096–98 (9th Cir. 1979). Moreover, defendant's argument ignores the legislative history of the Act. According to the House Report:

> To the extent a plaintiff joins a claim under one of the statutes enumerated in [42 U.S.C. § 1988] with a claim that does not allow attorney fees, that plaintiff, if it prevails on the non-fee claim, is entitled to a determination on the other claim for the purpose of awarding counsel fees. . . . In some instances, however, the claim with fees may involve a constitutional question which the courts are reluctant to resolve if the nonconstitutional claim is dispositive. *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). In such cases, if the claim for which fees may be awarded meets the

"substantiality" test, see *Hagans v. Lavine, supra; United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), attorneys' fees may be allowed even though the court declines to enter judgment for the plaintiff on that claim, so long as the plaintiff prevails on the non-fee claim arising out of a "common nucleus of operative fact". *United Mine Workers v. Gibbs, supra* at 725, 86 S.Ct. at 1138.

H.R.Rep. No. 94–1558, 94th Cong., 2d Sess. 4, n. 7 (1976).

A constitutional claim fails the "substantiality" test if it is "wholly insubstantial," "obviously frivolous," "plainly unsubstantial," or "obviously without merit." *Hagans v. Lavine*, 415 U.S. 528, 537, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974). In other words, a claim is insubstantial if "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." *Id.* at 538 ·39, 94 S.Ct. at 1379.

Here plaintiffs' § 1983 claims pass the substantiality test. In their complaint, plaintiffs included two causes of action based on § 1983. They contended that the public hearings on the proposed freeway project were so defective that the acquisition of real estate for the right-of-way on the basis of those hearings violated the due process clauses of the Fifth and Fourteenth Amendments. They also contended that the housing market in Los Angeles County was so rigidly segregated and the available replacement housing so limited that the state's displacement of black residents of the freeway corridor constituted a denial of equal protection of the laws in violation of the Fourteenth Amendment. These causes of action raised serious questions that cannot be dismissed as wholly frivolous or obviously without merit. The court holds that plaintiffs' § 1983 claims comply with the substantiality test set forth in *Hagans v. Lavine, supra.*[3]

**3.** The fact that some of plaintiffs' § 1983 claims may arguably be based on the violation of statutory rather than constitutional rights does not defeat their position. *Tongol v. Usery*, 601

The court next addresses the question whether the § 1983 claims and the statutory claims based on the National Environmental Policy Act of 1969, the California Environmental Quality Act of 1970, the Federal-Aid Highway Act of 1968, and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 arise out of a "common nucleus of operative fact." In granting the preliminary injunction on the basis of the statutory claims, the court found it unnecessary to rule on the constitutional issues. *Keith v. Volpe*, 352 F.Supp. at 1350. Nonetheless, the constitutional claims were vindicated by the preliminary injunction because the court's order required responsible officials to hold additional public hearings, conduct further housing availability studies, and give satisfactory assurances that adequate replacement housing would be available for all residents of the freeway corridor. Moreover, these statutory and constitutional claims are sufficiently interrelated that they would ordinarily be tried in one action. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Thus the requirement expressed in the legislative history that the claims arise out of the same operative facts is satisfied.

■ Plaintiffs may be considered as " 'prevailing parties' for attorneys' fees purposes [under § 1988] if they succeed on any significant issue in litigation which achieves some of the benefits the parties sought in bringing suit." *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978). The fact that benefits were achieved through a consent decree rather than through a trial and judgment is of no consequence. *Gagne v. Maher*, 594 F.2d at 341; *Criterion Club of Albany v. Bd. of Com'rs*, 594 F.2d 118, 120 (5th Cir. 1979); *cf. Richardson v. Civil Service Comm'n*, 420 F.Supp. 64, 67 (S.D.N.Y. 1976). Plaintiffs here achieved virtually all the benefits they sought in bringing suit. In their prayer for relief, they sought the preparation of environmental impact state-

ments required by federal and state environmental protection laws. In addition, they sought public hearings and housing studies to remedy the statutory and constitutional violations alleged in the complaint. The preliminary injunction and the Final Consent Decree not only alleviated plaintiffs' concerns, but also vindicated important public policies, including the environmental concerns embodied in the National Environmental Policy Act of 1969 and the California Environmental Quality Act of 1970. The extensive benefits achieved through this litigation have been summarized earlier in this Memorandum. The court concludes that plaintiffs are the "prevailing parties" on their statutory claims. That being the case, and since the Eleventh Amendment does not prohibit an attorneys' fee award under § 1988, in the circumstances of this case, the court rules that plaintiffs are entitled to reasonable attorneys' fees under 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1976.

*Common Fund/Common Benefit Doctrine*

■ Plaintiffs' second theory of entitlement to an award of attorneys' fees against the state is based on the equitable common fund or common benefit doctrine. Under this doctrine, a successful litigant, whose efforts create a common fund or a common non-monetary benefit for an identifiable class, is entitled to recover attorneys' fees from the benefited class; otherwise, the class would reap the benefits resulting from the lawsuit without shouldering its fair share of the financial burden of the litigation. The Supreme Court limited this doctrine in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), to those cases where the members of the benefited class are sufficiently identifiable and the tangible benefits sufficiently ascertainable so that fee shifting would "with some exactitude" shift the costs of the litigation to those benefiting from the suit. *Id.* at 265 n. 39, 95 S.Ct. at 1626 n. 39. *See also U. S. v. Imperial*

F.2d 1091, 1098 (9th Cir. 1979); *La Raza Unida of Southern Alameda County v. Volpe*, 440

F.Supp. 904, 910 (N.D.Cal.1977).

*Irrigation Dist.*, 595 F.2d 525, 529 (9th Cir. 1979); *Reiser v. Del Monte Properties Co.*, 605 F.2d 1135, 1139 (9th Cir. 1979).

 Defendant opposes the application of the common fund/common benefit doctrine to this case because the Eleventh Amendment bars a retroactive award of compensatory damages against the state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The only exceptions to this prohibition occur when Congress abrogates state immunity through statutory enactments (e. g., the Civil Rights Attorney's Fees Awards Act of 1976), or when a monetary award is not a form of retroactive compensation for past illegal acts but is only a "necessary consequence of compliance in the future" with court orders that are prospective in nature. *Edelman v. Jordan*, 415 U.S. at 668, 94 S.Ct. at 1358. The latter exception has been stated another way: if a monetary award would have only an "ancillary effect" on the state treasury, the award is considered outside the reach of the Eleventh Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 457–58, 96 S.Ct. 2666, 2671–72, 49 L.Ed.2d 614 (1976). The Court in *Bitzer*, however, left open the question whether attorneys' fees awards are properly considered "ancillary" under the *Edelman* rationale. *Id.* at 458, 96 S.Ct. at 2672.

 The Second Circuit has held that an award of attorneys' fees would, at most, have the ancillary effect on the state treasury which is permissible under *Edelman*. *Jordan v. Fusari*, 496 F.2d 646, 651 (2d Cir. 1974). *Accord, Gagne v. Maher*, 594 F.2d at 341, 341 n. 4. The Ninth Circuit summarily disposed of the issue in the pre-*Edelman* case of *Brandenburger v. Thompson*, 494 F.2d 885 (9th Cir. 1974). *Brandenburger* may not be viable authority post-*Edelman* and the court will not rely upon it. Nevertheless, an attorneys' fees award is ancillary to permissible injunctive and other non-monetary relief because the recovery of such fees is neither a motivating factor nor the raison d'etre of the lawsuit. Such fees are distinct from compensatory damages that make the plaintiff whole for past mal-feasance. Rather, attorneys' fees are the necessary adjunct of an appeal to a court of equity for vindication of constitutional and statutory rights. *Newman v. State of Alabama*, 522 F.2d 71, 75–76 (5th Cir. 1975) (Gewin, J., dissenting); *see also La Raza Unida of Southern Alameda County v. Volpe*, 440 F.Supp. 904, 913 (N.D.Cal.1977). Accordingly, this court rules that a fee award under the equitable common fund/common benefit doctrine is not barred by the Eleventh Amendment.

 The instant action falls within the scope of the common fund/common benefit doctrine set forth in *Alyeska, supra*. By successfully obtaining an injunction halting further work on the Century Freeway until governmental officials complied with federal and state laws designed to protect the human environment, by successfully protecting the interests of those persons whose civil rights have been adversely effected by the freeway project, and by successfully negotiating a Final Consent Decree, plaintiffs, by their efforts, have conferred substantial tangible benefits, both pecuniary and non-pecuniary, on the State of California and its inhabitants—an identifiable, albeit large, class of beneficiaries. In short, plaintiffs' successful efforts in this litigation, carried out over an eight-year period, have brought about unprecedented, concrete benefits to the State of California and its inhabitants. There is an extraordinary difference between the state's original proposal to build a ten-lane freeway typical of those constructed in California during the 1950's and 1960's and the project that is to be built pursuant to the terms of the Final Consent Decree. The unique features of the project include: (1) a variety of mass transit features, including a forty-foot median strip for buses or rail, numerous stations, adjacent park-and-ride facilities, and pedestrian accessways; (2) similar transit features on the Harbor Freeway to connect the downtown region to Los Angeles International Airport; (3) 4,200 units of low and moderate income housing to be relocated or newly constructed in the areas adjacent to the freeway and paid for out of gas tax

revenues as costs of the construction project; (4) an Office of the Corridor Advocate to represent and protect the interests of some 9,000 future displacees and to ensure that they receive the benefits and assistance due them; and (5) an affirmative action employment plan tailored to meet the needs of the residents of the corridor area where there is an unusually high incidence of unemployment.

The enormous environmental and social benefits of the settlement can be expressed in terms of dollar value as well. The consent decree provides for 4,200 units of low and moderate income housing having an estimated value of $250,000,000.00—housing that would not have been provided in the absence of this litigation. Ninety-two percent of the cost of this massive housing program will be funded by the federal government. The cost of the transitway and support facilities on the Harbor Freeway, ninety-two percent of which will be funded by the federal government, is estimated by Caltrans to be $140,000,000.00. The cost of the rapid transit facilities now incorporated into the Century Freeway project is less susceptible to precise measurement, but the value and the cost of those facilities are substantial and undoubtedly in excess of $100,000,000.00. These figures do not measure the value of the affirmative action employment and job-training programs which will ensure that minorities, women, and residents of the corridor get a fair share of the 20,000 job opportunities generated by the project. These figures also do not include an estimate of the value of services provided by the Office of the Corridor Advocate or an estimate of the value of other non-pecuniary benefits such as improved freeway design and transportation planning which also accrue to the residents of the state as a result of plaintiffs' efforts. Considering only the housing as-

pect of the Final Consent Decree, the State of California will receive a net identifiable pecuniary benefit of at least $230,000,000.00 in federal funds as a result of plaintiffs' efforts. In light of the extensive benefits described in the consent decree, accruing to the state as a result of the excellent work performed by plaintiffs' counsel during this litigation, the court concludes that counsel are entitled to an award of reasonable attorneys' fees under the common fund/common benefit doctrine. An award of fees in this case will shift the costs of the litigation "with some exactitude" to those benefiting from the suit. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. at 265 n. 39, 95 S.Ct. at 1626 n. 39.

## II. *FEE AWARD*

■ Once entitlement to fees is established, the Ninth Circuit, recognizing the difficulty of weighing factors relevant to the determination of reasonable fees, grants district courts wide discretion in setting attorneys' fees. *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 69 (9th Cir. 1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 681 (N.D.Cal.1974).

In *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d at 70, the Ninth Circuit adopted the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), as appropriate guidelines which courts should consider in determining reasonable attorneys' fees.[4] Not all twelve factors need be considered by the district court, only those called into question by the case at hand and necessary to support, for the purpose of meaningful review, the reasonableness of the fee award. *Stanford Daily v. Zurcher,* 64 F.R.D. at 682. Accordingly, in determining the reasonableness of the sums requested by plaintiffs' counsel,

**4.** The twelve factors listed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974), are: the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; the preclusion of other employment due to acceptance of the case; the customary fee; the contingent or fixed nature of the fee; the time limitations imposed by the client or the case; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the "undesirability" of the case; the nature of the professional relationship with the client; and awards in similar cases.

this court will address the factors relevant to this case.

### General Observations

The court has presided over this case from its inception eight years ago. During that time the court has had the opportunity to evaluate first-hand the work of plaintiffs' counsel during extensive hearings in the courtroom and in numerous briefs and memoranda filed by them. Throughout the course of this litigation, plaintiffs' counsel have demonstrated their constant dedication and devotion to the environmental and human concerns affected by this freeway project. Their work in the courtroom and in writing has been of exceptionally high quality. With these observations in mind, the court now addresses the factors relevant to determining the fee award in this case.

### Novelty and Difficulty of the Issues

The novel, difficult, and complex factual and legal questions involved in this litigation and in its settlement are addressed in this court's opinion in *Keith v. Volpe*, 352 F.Supp. 1324 (C.D.Cal.1972), and in the Final Consent Decree. The opinion, which considers numerous environmental and related issues, was the first reported judicial construction of the California Environmental Quality Act of 1970. Moreover, the consent decree, which resolves a multitude of problems connected with the project, provides for the first use, in the nation, of federal gas tax revenues to rehabilitate and construct replacement housing for dwellings demolished by freeway construction.

### Contingent Nature of the Fee and the "Undesirability" of Case

None of the organizational plaintiffs, the N.A.A.C.P., Sierra Club, and the Environmental Defense Fund, had any pecuniary interests at stake in the litigation. The individual plaintiffs were not in a position to reap significant financial rewards as a result of the outcome of this suit. Given the nature of this lawsuit, no public attorney, state or federal, would have instituted this action. Finally, the extraordinary length, complexity, and difficulty of the case, together with the absence of any fee-paying client, would have virtually precluded private attorneys from undertaking the time-consuming prosecution of this matter.

Moreover, the fee award here was extraordinarily contingent in two respects. Plaintiffs' probability of success on the merits was difficult to predict at the outset, as was their entitlement to a fee award in the event they successfully represented their clients' interests. In fact, the question of entitlement to attorneys' fees, in the circumstances of this case, was subject to much debate during the years this litigation was pending. As a result, plaintiffs' attorneys devoted over the years an enormous amount of time and resources to this litigation without any assurance of payment for services rendered.

### The Work and Ability of Counsel, the Amount Involved, and the Results Obtained

Plaintiffs' action, seeking a court-ordered halt to a massive freeway project, already underway, presented complex and novel statutory and constitutional claims. In developing, analyzing, and researching the issues in this case, counsel exhibited creativity and originality grounded in sound legal analysis. In structuring and concluding the settlement agreement, plaintiffs' counsel not only exhibited their legal skills but also demonstrated their negotiating expertise. Throughout, plaintiffs' attorneys ably employed the exceptional legal talents required to manage, direct, and settle this protracted, complex case. Moreover, plaintiffs' counsel enjoy a reputation in the community of the highest order. Their work in this case was in keeping with the highest traditions of the California Bar. Had it not been for plaintiffs' counsel, the named plaintiffs, more likely than not, would have gone unrepresented and unprotected.

In short, plaintiffs' counsel provided first-rate legal services in successfully advocating the protection of the environmental and human interests at stake in this lawsuit involving a $1.5 billion freeway construction project. This conclusion weighs heavily in

favor of increasing the fee award. *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 687 (N.D.Cal.1974). The state defendant contends, however, that plaintiffs' counsel cannot claim sole credit for the benefits embodied in the Final Consent Decree and that, therefore, the court should adjust any fee award accordingly. Specifically, the state contends that the consent decree was a political settlement stimulated in part by the political milieu in Sacramento and Washington and facilitated by the state's good faith willingness to compromise. Defendant also argues that the replacement housing features and the affirmative action program, while novel and beneficial to residents in California, were not within the scope of the rights plaintiffs sought to enforce when they filed this action, and could not have been achieved through a trial on the merits.

Defendant's first argument is unpersuasive. The good faith of the state in negotiating a settlement is not a controlling factor in determining whether plaintiffs' counsel merit a fee award. *Nadeau v. Helgemoe,* 581 F.2d at 280. Moreover, the go-slow strategy followed by the state defendant during the first five years of this litigation might have defeated less tenacious opposing counsel. Furthermore, the central issue in the determination of a fee award is the provocative role of plaintiffs' lawsuit, not the motivations of the defendant. *Id.* If the efforts of plaintiffs' counsel were necessary and important factors in achieving the benefits embodied in the consent decree, even though those benefits could not have been achieved without the constructive leadership of public officials, plaintiffs would still be entitled to a fee award. *Id.* at 281. Here plaintiffs' vigorous prosecution of this lawsuit was the force that prompted the state and federal defendants to agree to the extensive benefits embodied in the consent decree. The fee to be awarded by this court will properly reflect the role of plaintiffs' counsel in fashioning the terms of the settlement.

Defendant's second argument that the court, in setting the fee award, should not consider the housing and affirmative action programs because they were not prayed for in the complaint, is also without merit. To limit a fee award by considering only those settlement items prayed for in the complaint would stifle the settlement process by discouraging counsel from negotiating on and agreeing to important items which, though not originally contemplated when the action was filed, induce settlement because they are mutually beneficial. Moreover, to so limit a fee award would penalize counsel who advance novel solutions aimed at vindicating important concerns shared by the parties. Plaintiffs' counsel should be commended, not penalized, for their resourcefulness in securing through the settlement process a result more beneficial than traditional remedies might have achieved. One other point: the preliminary injunction demonstrated that plaintiffs' claims were not frivolous, unreasonable, or groundless and that they would most likely support some form of permanent relief; therefore, in agreeing to the consent decree, state defendant was not acting gratuitously. *Nadeau v. Helgemoe,* 581 F.2d at 281. Thus, the court rejects defendant's suggestion that the award of attorneys' fees to plaintiffs' counsel should be diminished because there were beneficial features in the settlement agreement that arguably fall outside the scope of relief prayed for in the complaint.

III. *CALCULATION OF FEES; TIME AND LABOR REQUIRED; MULTIPLIER*

This court adopts the method of computing reasonable attorneys' fees set out in *Lindy Bros. Bldrs., Inc. v. Amer. R. & S. San. Corp.,* 487 F.2d 161 (3d Cir. 1973). The Ninth Circuit approved this method in *Brandenburger v. Thompson,* 494 F.2d 885, 890 n. 7 (9th Cir. 1974).

Under *Lindy,* the court fixes a reasonable hourly rate for the attorneys' time and multiplies the hourly rate for each attorney by the number of hours worked. After this "lodestar" sum is reached, the court then considers the contingent nature of the action and the quality of the attorneys' ef-

forts to determine whether an increase or decrease of the lodestar is mandated. If the court determines that the lodestar sum should be increased because of the contingent nature of the action and the quality of the attorneys' work, then the court determines what an appropriate "multiplier" should be. When historical hourly rates are used, another appropriate factor to consider in arriving at the proper "multiplier" is the effect of inflation and other hardships caused by a delay in receiving compensation for services. This additional factor is set forth in *Weiss v. Drew National Corp.*, 465 F.Supp. 548 (S.D.N.Y.1979), and will be considered by the court in the instant computations.

The court finds the following hourly rates and claimed number of hours to be fair and reasonable:

ATTORNEY SERVICES

| SENIOR ATTORNEYS | Historical Hourly Rates | Hours | Total |
| --- | --- | --- | --- |
| 1971 | $50.00 | 113.50 | $5,675.00 |
| 1972 | 55.00 | 1449.25 | 79,708.75 |
| 1973 | 62.00 | 591.00 | 36,642.00 |
| 1974 | 75.00 | 335.50 | 25,162.50 |
| 1975 | 81.25 | 261.50 | 21,246.87 |
| 1976 | 88.75 | 77.50 | 6,878.12 |
| 1977 | 92.50 | 237.25 | 21,945.62 |
| 1978 | 106.00 | 920.50 | 97,573.00 |
| 1979 | 117.50 | 651.50 | 76,551.25 |
| ASSOCIATES | Hourly Rates | Hours | Total |
| 1971 | $25.00 | 120.00 | $3,000.00 |
| 1972 | 30.00 | 605.00 | 18,150.00 |
| 1973 | 35.00 | 331.00 | 11,585.00 |
| 1974 | 47.50 | 77.50 | 3,681.25 |
| 1978 | 47.50 | 387.50 | 18,406.25 |
| 1979 | 70.00 | 389.00 | 27,230.00 |
| FELLOWS | Hourly Rates | Hours | Total |
| 1976 | $48.33 | 28.00 | $1,353.24 |
| 1977 | 48.33 | 139.50 | 6,742.04 |
| 1978 | 47.50 | 770.50 | 36,598.75 |
| 1979 | 50.00 | 350.50 | 17,525.00 |
| TOTAL FOR SERVICES OF ATTORNEYS | | | $515,654.64 |

Defendant opposes the inclusion of the hours reported for two attorneys, Mary Nichols and Fredric Sutherland, on the ground that their hours are not properly verified. The court finds, however, that their hours are properly verified and that it is reasonable to include those hours in the fee calculations.

*Law Clerks/Paralegals*

The Ninth Circuit has approved including charges for law clerk/paralegal services as part of an attorneys' fees award. *Pac. Coast Agr. Export Ass'n. v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1210 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). The rationale for including these charges in the fee award is that paralegal and law clerk personnel provide necessary services which, were they performed by attorneys, would be more costly. This court concludes that the fee award in this case should properly include reasonable charges for the work of law clerks and paralegals. Moreover, the fees

and hours listed below for law clerk and paralegal services are fair and reasonable in light of the extensive research that this litigation generated.

### Planner

■■■ Defendant objects to the inclusion of charges for the services of an urban planner, Nancy Lewis, in 1978. The court finds, however, that the services contributed by Ms. Lewis, in light of the particular environmental and technical issues raised by this case, are comparable to the services provided by law clerks. Ms. Lewis performed the type of analysis that in her absence would have been provided by staff attorneys. Her contribution to the litigation undoubtedly saved attorney time and expense. The court finds that a charge for her services is properly included in a fee award and that the fees and hours listed below for her services are reasonable under the circumstances of this case.

### LAW CLERK/PARALEGAL/PLANNER SERVICES

| LAW CLERKS | Historical Hourly Rates | Hours | Total |
|---|---|---|---|
| 1971 | $20.00 | 105 | $2,100.00 |
| 1972 | 20.00 | 910 | 18,200.00 |
| 1973 | 20.00 | 420 | 8,400.00 |
| 1974 | 20.00 | 175 | 3,500.00 |
| 1975 | 20.00 | 105 | 2,100.00 |
| 1976 | 20.00 | 70 | 1,400.00 |
| 1977 | 20.00 | 175 | 3,500.00 |
| 1978 | 25.00 | 910 | 22,750.00 |
| 1979 | 25.00 | 630 | 15,750.00 |
| PARALEGAL | Hourly Rates | Hours | Total |
| 1971 | $20.00 | 480 | $9,600.00 |
| 1972 | 20.00 | 300 | 6,000.00 |
| PLANNER | Hourly Rates | Hours | Total |
| 1978 | $25.00 | 836.5 | $20,912.50 |
| TOTAL | | | $114,212.50 |

| | |
|---|---|
| Attorneys' Services | $515,654.64 |
| Law Clerk/Paralegal/Planner Services | 114,212.50 |
| TOTAL | $629,867.14 |

The court finds that a multiplier of 3.5 properly reflects the contingent nature of the case and the quality of counsel's efforts as described above. This multiplier also takes into account the effect of the delay between the time plaintiffs' counsel rendered their services and the date on which the order determining their entitlement to fees was entered. In addition, this multiplier properly compensates for the impact of inflation on the historical rates. Thus, when the $629,867.14 is multiplied by 3.5, the award of attorneys' fees comes to $2,204,534.99.

### IV. REIMBURSEMENT FOR CERTAIN COSTS AND EXPENDITURES

■■■ Plaintiffs seek $40,142.57 in reimbursement for certain expenditures made

by them during the prosecution of this case. These expenditures include costs of mailing, duplicating, long distance telephone calls, secretarial overtime, transcripts (it is unclear what this term includes), and out-of-town travel to Sacramento, Washington, D.C., and the San Francisco bay area. The court views all of these items except the out-of-town travel expenses as essentially overhead costs to be absorbed in the attorneys' fees award, and declines to order their reimbursement. As to the out-of-town travel expenses, the court finds that item to be reasonable in amount and the type of expense that would ordinarily be charged to the client. In the circumstances of this case, the court concludes that equity requires that plaintiffs' counsel be reimbursed for travel expenses necessarily incurred during the litigation. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939). Accordingly, plaintiffs' counsel are awarded $24,778.12 as reimbursement for such travel expenses.

THEREFORE, IT IS ORDERED that state defendant pay to plaintiffs' counsel, Center for Law in the Public Interest, the sum of $2,229,313.11 as reasonable attorneys' fees and reimbursement for necessary travel expenses. If the services of counsel are further required at the trial or appellate level to enforce the terms of the Final Consent Decree, including provisions regarding payment of attorneys' fees, the court reserves jurisdiction to order an additional award.

The Clerk of the Court shall serve copies of this Order, by United States mail, upon the attorneys of record for the parties appearing in this action.