**Tallulah MORGAN et al., Plaintiffs,**

v.

**John J. McDONOUGH et al., Defendants.**

**Civ. A. No. 72–911–G.**

United States District Court,
D. Massachusetts.

March 25, 1981.

Larry Johnson, Center for Law and Education, Gutman Library, Cambridge, Mass., Laurence S. Fordham, Foley, Hoag & Eliot, Boston, Mass., for plaintiff.

Caroline Playter, Boston, Mass., Kenneth Kimberling, Puerto Rican Legal Defense, New York City, for El Comite.

Robert Blumenthal, Counsel, State Board of Education, Robert H. Bohn, Jr., Asst.

Atty. Gen., Dept. of Atty. Gen., Boston, Mass., for State Board of Education.

Steven P. Perlmutter, Asst. Corporation Counsel, Boston, Mass., for Mayor of City of Boston.

James T. Grady, Grady & McDonald, Boston, Mass., for BTU—Boston Teachers Union.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for BASAS—Boston Association of School Administrators and Supervisors.

Thayer Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., for Boston Home and School Association.

Martin A. Walsh, Community Relations Service, Boston, Mass., for Community Relations.

Alifa Mahmoud, Staff Director, Citywide Parents' Advisory Council, Boston, Mass., for Citywide Parents' Advisory Council.

Marshall Simonds, Henry C. Dinger, Goodwin, Procter & Hoar, Michael Betcher, General Counsel, Boston School Committee, Diane Moriarty, Log Officer, Boston School Committee, Dept. of Implementation, Boston, Mass., for Special Counsel Boston School Committee and Boston School Department.

## MEMORANDUM AND INTERLOCUTORY ORDER CONCERNING PLAINTIFF–INTERVENOR EL COMITE'S RENEWED MOTION FOR ATTORNEYS' FEES AND COSTS

GARRITY, District Judge.

This matter is before us on El Comite's renewed motion for a liability finding on the issue of attorneys' fees and costs pursuant to the Emergency School Aid Act, 20 U.S.C. § 3205 (formerly 20 U.S.C. § 1617) and the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. § 1988,[1] or, in the

1. The two statutes contain the following language:
20 U.S.C. § 3205
Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), of the United States (or any agency thereof), for failure to comply with any provision of this subchapter or for discrimination on the basis of race, color, or national origin in violation of Title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the

alternative, under this court's equitable power, as set forth in *Alyeska Pipeline Service Co. v. Wilderness Society*, 1975, 421 U.S. 240, at 258–59, 95 S.Ct. 1612, at 1622, 44 L.Ed.2d 141. A prior motion for such an award and costs was filed on November 14, 1975. The school defendants and the city defendants filed oppositions to the original motion, and an opposition to the renewed motion was filed by the city defendants[2] on January 27, 1981, to which El Comite filed a reply on February 2, 1981. All of the issues have been fully briefed by counsel, and oral argument was heard on February 2, 1981.

■ The primary question presented by plaintiff-intervenor El Comite de Padres' renewed motion is a preliminary one, viz., whether the absence of an explicit judicial determination that the school defendants intentionally discriminated against El Comite's clients—Hispanic students in the Boston public schools and their parents—precludes El Comite from meeting the requirements for a "prevailing party" under 20 U.S.C. § 3205 and 42 U.S.C. § 1988. For the reasons stated below, we hold that the absence of such a determination does not bar El Comite from being considered a prevailing party within the meaning of these statutes. El Comite has not yet submitted any of the detailed filings needed for a determination of the amount of fees and costs to which it is entitled. Due to El Comite's unique role in this case, described below, we will not rule upon the question of the defendants' liability for such expenses in the abstract; therefore, no finding of liability will be entered at this time, but the submission of further information will be required.

*Background*

At the time of this court's June 21, 1974 liability holding, other minority students comprised approximately 7% of the Boston public school population. Although the black plaintiffs did not seek to demonstrate discrimination against other minority students, the original liability finding did recognize Hispanic students as an identifiable segment of the Boston school system. *Morgan v. Hennigan*, D.Mass., 1974, 379 F.Supp. 410 at 415, n. 1 and 424, aff'd sub nom. *Morgan v. Kerrigan*, 1 Cir., 1974, 509 F.2d 580, cert. den. 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). In fact, many of the exhibits used to assess the racial and ethnic composition of the Boston schools referred to Hispanics or other minorities or spoke in terms of white and non-white categories. See 379 F.Supp. at 424, 426, 428–29, 437–39, 443–45 and 467. In 1974 we noted particularly a state court determination that open enrollment had been operated in a discriminatory manner, so as to hinder and in many cases exclude both black *and other minority students* from transferring to schools that had empty seats. *Id.* at 450–51.

There is, moreover, no indication that the School Department distinguished between Hispanic and non-Hispanic blacks in its discriminatory practices. The situation was later summarized as follows:

> Black *and other minority* children suffered even greater educational deprivations as the schools they attended were the most crowded, the oldest, the least well maintained and the most poorly staffed that the School Committee could

court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. Pub.L. 89–10, Title VI, § 601(a), Nov. 1, 1978, 92 Stat. 2266.

42 U.S.C. § 1988

. . . In any action to enforce a provision of sections 1981, 1982, 1983, and 1986 of this Title, Title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the

United States Internal Revenue Code, or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. As amended Pub.L. 94–559, § 2, Oct. 19, 1976, 90 Stat. 2641.

2. The city defendants filed the opposition to El Comite's renewed motion on its own behalf and on behalf of the school defendants, since any fees which would be assessed will be paid out of the city budget rather than the School Department budget.

offer. (Emphasis added.) 401 F.Supp. at 223.

Accordingly, the 1974 liability holding states that, although other minority parents and students had not been represented by the black plaintiffs, in devising a remedy consideration would be given to the treatment of other minorities. 379 F.Supp. at 415, n. 1. Thus, our October 31, 1974 Order Establishing Filing Date and General Contents of Student Desegregation Plan ordered the defendants to draft a plan which would, *inter alia*, "avoid burdening more black *and other-minority* students than white students by transportation, school closings, and other measures . . . ." *Id.* at 3 (Emphasis added). The October 31, 1974 Order also set forth the following guideline:

> Other minority students, i. e., Spanish speaking, Orientals, American Indians, etc., shall be afforded equally desegregated education. The plan for student desegregation shall provide for the operation of bilingual education . . . on a desegregated basis. *Id.*

Early the following year, on January 23, 1975, El Comite de Padres was permitted to intervene as a party plaintiff on behalf of the Hispanic school children in the Boston public schools, and their parents. The Amended Motion to Intervene stated that intervention was necessary to "protect the interests of Hispanic children, particularly in regard to the bilingual education programs" and "to provide technical assistance in working out a plan that will meet the needs of Spanish-speaking students." In particular, plaintiff-intervenors sought to protect the rights of Hispanic children to receive a bilingual education under Mass. G.L. c. 21A and under the federal Civil Rights Act of 1964, 42 U.S.C. § 2000d, as set forth in *Lau v. Nichols*, 1974, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1. The motion to intervene was unopposed. At the same time, El Comite filed a separate Complaint in Intervention, alleging intentional discrimination against Hispanic students. The complaint has never been answered.

The court permitted intervention "to be certain that the rights of Spanish-speaking students and parents are protected in the plan . . ." but specifically refused to consider the issue of intentional discrimination against other minorities in the remedy stage of this case. Transcript of January 23, 1975 hearing, at 8.

During the following month, El Comite participated fully in the hearings before the panel of Masters appointed to consider various desegregation plans and proposals and, as a result, the remedial plan adopted by the court on June 5, 1975 addresses the concerns of bilingual and other minority students, adopting several of the recommendations of El Comite. In particular, assignment guidelines and procedures were affected by the participation of El Comite:

> El Comite de Padres Pro Defensa de la Educacion Bilingue . . . have stressed their right to adequate bilingual education. The remedy accordingly concentrates on providing bilingual schooling of Hispanic students and for others in need of this service.

> Assignment of bilingual students before others will prevent excessive dispersal. Thus the "clustering" of bilingual classes will be possible and Boston's schools will be enabled to fulfill the promise of this state's exemplary bilingual education law . . . as well as to meet the requirements of the Federal Civil Rights Act of 1964 . . . .

401 F.Supp. at 242.

The June 5, 1975 order also reiterates the promise of an "equally desegregated education" for other-minority students—both bilingual and non-bilingual—and requires that other minorities be considered separately in making student assignments.

Plaintiff-intervenor has continued to represent the rights of bilingual, Hispanic, and other "other-minority" groups throughout the protracted remedial phase of the case. Due to the continued activities of plaintiff-intervenor in the remediation process, staff desegregation orders and voluntary agreements now reflect the need to recruit other

minority administrators and faculty;[3] advanced work classes have been opened for bilingual children; parent involvement has been ordered for other minority parents; extended day bilingual kindergarten programs have been opened; support services are to be provided to Hispanic children at the examination schools; and the bilingual programs contain proper clusters of classes. Plaintiff intervenor has also been involved in the ending of the receivership at South Boston High School; in the negotiations concerning parent monitoring; in the recommendations and hearings on a revised Code of Discipline; in the recommendations and hearings concerning a Unified Facilities Plan and Unified Vocational Education Plan; and in the progress and form that administrative reorganization of the school system is taking under desegregation.

### Preliminary Considerations

Several preliminary matters require brief comment. First, the questions presented by El Comite's renewed motion for attorneys' fees and costs are governed by the terms and requirements of the attorneys' fees statutes; we need not reach the issue of whether an equitable award of fees would be warranted under the principles enunciated in *Alyeska Pipeline, supra*. *Northcross v. Board of Education of the Memphis City Schools*, 6 Cir., 1980, 611 F.2d 624, 632–633.

Second, under the circumstances of this case, it makes no difference whether plaintiff-intervenors base their claim on 20 U.S.C. § 3205 or on 42 U.S.C. § 1988, since, here, it is clear that the only additional substantive requirement imposed by 20 U.S.C. § 3205—i. e., that the proceedings be "necessary to bring about compliance"—has been met. El Comite's participation in these proceedings was necessary to bring about compliance with Title VI of the 1964 Civil Rights Act, since without El Comite's participation, excessive dispersal and inade-

quate clustering of bilingual students would undoubtedly have occurred. Hispanic kindergartners, would not have been provided with a bilingual education; bilingual vocational educational offerings would not have been expanded, and the improper assignments of Hispanic students would not have been rectified. El Comite's intervention was also necessary to ensure compliance with our June 5, 1975 order that other minority students be provided with an "equally desegregated education." Plaintiff-intervenors, rather than the School Department, have actively pressed for the effectuation of these rights, e. g., by urging other minority representation in the parent group structure and seeking inclusion of other minorities in faculty and administrator desegregation orders. We therefore find that the intervention of El Comite de Padres was necessary to bring about compliance with Title VI of the Civil Rights Act of 1964, and with outstanding orders of this court.

■ Third, the requirement under 20 U.S.C. § 3205 that there be a "final order" before fees are awarded does not pose an obstacle to the award of fees in this case. As the Supreme Court stated in *Bradley v. Richmond School Board*, 1974, 416 U.S. 696, 722–723, 94 S.Ct. 2006, 2021–2022, 40 L.Ed.2d 476: "Since most school cases can be expected to involve relief of an injunctive nature that must prove its efficacy only over a period of time and often with frequent modifications, many final orders may issue in the course of the litigation. To delay a fee award until the entire litigation is concluded would work substantial hardship on plaintiffs and their counsel and discourage the institution of actions despite the clear congressional intent to the contrary ...." Thus, the entry of any order that determines substantial rights of the parties may be an appropriate occasion upon which to consider the propriety of an

---

**3.** The defendant school committee appealed an other-minority hiring provision in the Faculty Hiring Order of July 5, 1978. This appeal was withdrawn and the underlying order vacated on February 1, 1980 after negotiations led to the adoption by the school defendants of a resolu- tion on desegregation of staff for other minorities and adoption of the Voluntary Lau Compliance Plan and the Resolution on Desegregation of Staff were filed with this court pursuant to the request to vacate the July 5, 1978 order regarding other minority faculty hiring.

award of counsel fees in school desegregation cases. *Id.* at 722–723, n. 28, 94 S.Ct. at 2022 n. 28. Since many such orders have been entered in this case, El Comite's application for fees is not premature.

### The "Prevailing Party" Requirement

The primary question, then, is whether El Comite is a "prevailing party" within the meaning of the statutes. The definition of a "prevailing party" for attorneys' fee purposes is set forth in *Nadeau v. Helgemoe*, 1 Cir., 1978, 581 F.2d 275, 278–279, as follows:

> Plaintiffs may be considered "prevailing parties" for attorney fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit. However, the amount of attorney's fees should be based on the work performed on issues in which they were successful . . . .

By this definition, it seems clear that El Comite is a prevailing party, and is therefore entitled to attorneys' fees, at least with respect to some of their efforts in these proceedings. In particular, El Comite achieved one of the goals it sought through intervention with the entry of our 1975 order permitting student assignments to bilingual classes prior to regular student assignments, thus assuring bilingual students' rights under state law and under Title VI of the 1964 Civil Rights Act, as enunciated in *Lau v. Nichols, supra.* Attorneys' fees and costs in actions to enforce the rights guaranteed by the 1964 Civil Rights Act are compensable under the attorneys' fees statutes relied upon by the plaintiff. See *Aspira of New York, Inc. v. Board of Education of City of New York*, S.D.N.Y., 1975, 65 F.R.D. 541, 543. Moreover, plaintiff-intervenor's efforts in this regard fall squarely within the purposes of their original motion to intervene.

El Comite's participation has gone beyond protecting the rights of bilingual students under Title VI, and beyond the literal terms of the original motion to intervene: El Comite claims attorneys' fees and costs for asserting the Fourteenth Amendment rights of Hispanics and other minorities in the desegregation process. The defendants respond that, where they have not been found, by judicial decree or otherwise, to have discriminated against Hispanic students, El Comite cannot be considered a prevailing party with respect to their equal protection claims. Moreover, the defendants assume that all of El Comite's efforts in these proceedings have been directed at assuring the Fourteenth Amendment rights of other minorities to equal educational opportunity and that, therefore, no fees or costs may be awarded.

We disagree. As stated above, El Comite has protected the Title VI, as well as the constitutional, rights of bilingual students in the Boston public schools. At least at the time these claims were pressed and relief was granted, no finding of discriminatory intent was required under Title VI. *Lau v. Nichols, supra.*

Furthermore, to the extent that El Comite has successfully asserted the Fourteenth Amendment rights of other minority students and parents, the mere absence of a judicial finding of intentional discrimination does not bar recovery of fees. "Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." *Maher v. Gagne*, 1980, 448 U.S. 122, at 129, 100 S.Ct. 2570, at 2575, 65 L.Ed.2d 653, at 661. Thus, a party may be considered "prevailing" when it vindicates its client's civil rights through a consent judgment or without formally obtaining relief, so long as the suit was a necessary and important factor in achieving the improvements undertaken, and the underlying constitutional claim is not "frivolous, unreasonable, or groundless." *Nadeau v. Helgemoe, supra* at 281. See Senate Report No. 94–1011, 5 U.S.Cong. & Adm.News 1976, 5908, 5912. Similarly, where benefits are obtained through actual litigation rather than through a consent judgment, a full determination of the merits of the underlying constitutional claim is not always required;

fees may be awarded even if the court disposes of the matter on the basis of a statute which makes no provision for the award of attorneys' fees and costs, so long as the claims on which the plaintiff prevails arise out of a common nucleus of operative fact, and the constitutional claim is not "plainly insubstantial", "obviously frivolous" or "obviously without merit." *Keith v. Volpe,* C.D.Cal., 1980, 86 F.R.D. 565, 569. See also *Maher v. Gagne, supra,* 448 U.S. at 129, 100 S.Ct. at 2576, 65 L.Ed.2d at 663 (Eleventh Amendment does not bar such an award). On the present record, it can hardly be contended that El Comite's claims of intentional discrimination are frivolous or insubstantial. Thus, defendants' argument that attorneys' fees may not be awarded absent a judicial finding of intentional discrimination lacks legal support.

It is true, however, that due to the unique role of El Comite in these proceedings, the rationale for ordering an award here is different from that in other civil rights cases with which we are familiar. El Comite's entitlement to an award of attorneys' fees and costs in this case is not based primarily on its efforts to effectuate bilingual students' *Lau* rights, or on its attempts to press other minorities' own Fourteenth Amendment claims. These matters, while important and compensable under the statutes, are basically peripheral to this case.

It is primarily any contribution El Comite has made to the ongoing formulation of a workable desegregation remedy that brings this claim for an award within the ambit of the fee shifting statutes in the context of this litigation. Three-way desegregation has been found in this case to be necessary both to provide a proper remedy for the plaintiff black students and parents, and to provide all groups—black, white, and other minority—the sense of adequate representation necessary to achieve lasting desegregation. 401 F.Supp. at 242. And, as the Court of Appeals for the Second Circuit stated in awarding attorneys' fees to representatives of the Hispanic community who intervened in the remedial stage of a desegregation case:

Establishment of liability is but the first step. The precise remedy does not follow logically from the determination of liability, but rather reflects a careful reconciliation of the interests of the many affected members of the community and a choice among a wide range of possibilities. It is through the input of interested parties, such as intervenors, ... that a just remedy may be devised. *United States v. Board of Education of Waterbury, Conn.,* 2 Cir., 1979, 605 F.2d 573, at 576.

It follows that the extent of plaintiff-intervenor's contribution to the formulation and implementation of a just remedy in this case may be considered in fixing the amount of the award. *Id.* at 577.

It follows, too, that El Comite should not be denied compensation simply because defendants in school desegregation cases might thereby be encouraged to oppose the intervention of parties whose participation would ultimately aid in the construction of a just remedy. El Comite has participated fully in the proceedings in this case for more than six years, protecting a class which is in need of Fourteenth Amendment protection in desegregation cases. *Keyes v. School District No. 1, Denver, Colo.,* 1973, 413 U.S. 189 at 197–198, 93 S.Ct. 2686 at 2691–2692, 37 L.Ed.2d 548; *Guey Heung Lee v. Johnson,* 1971, 404 U.S. 1215, 92 S.Ct. 14, 30 L.Ed.2d 19; *Cisneros v. Corpus Christi Independent School District,* 5 Cir., 1972, 467 F.2d 142. The defendants do not suggest that plaintiff-intervenors' participation has not aided in the dismantling of Boston's dual school system, at least in some respects; in fact, El Comite's activity in the Hispanic community has helped ensure the acceptance by that growing sector of the student population. In fact, there are now 12,306 other minority students attending the Boston public schools, comprising approximately 19% of the student population. The representation of this large and increasing group is a task requiring significant commitment of time, resources and energy. To deny El Comite reasonable compensation for its efforts would severely undermine the spirit of cooperation needed to facilitate the desegregation process.

*Principles Governing the Award of Fees*

Under the circumstances of this case, however, we will withhold for the time being a finding that the defendants are liable for El Comite's attorneys' fees and costs. The complex nature of school desegregation cases requires that attorneys' fees be approached with flexibility if Congress' goal in enacting these statutes is to be realized, *United States v. Board of Education of Waterbury, supra* at 576. Furthermore "the entire litigation must be considered and evaluated to arrive at a just allowance," *Keyes,* 439 F.Supp. at 402. Therefore, submission of a relatively detailed petition for fees and costs must precede entry of any formal holding on the question of El Comite's right to reimbursement.

Also El Comite has not yet submitted the filings necessary to warrant a specific determination as to the amount of compensation recoverable. In making this determination, the court will follow the general procedure recently outlined by the Court of Appeals for the First Circuit in *Furtado v. Bishop,* 635 F.2d 915 (1 Cir., 1980). However, in light of the distinctive nature of El Comite's participation in these proceedings, several features of the fee award determination require special attention.

First, the fee award must be adjusted to account for the extent to which plaintiff-intervenor did not succeed in obtaining the relief sought. *Nadeau v. Helgemoe, supra* at 278–279.[4] Plaintiff-intervenors have participated in these proceedings on an ongoing basis, and determining the extent to which they have succeeded presents difficult problems of proof for the court and the parties. Not all of the benefits sought and obtained by El Comite are reflected in court orders or in formal agreements: the Hispanic community has benefited equally from the opening of lines of communication to the School Department and from the sense of participation in the desegregation process, which has been generated by El

Comite's efforts. As a starting point, however, it is necessary to obtain a precise specification of those issues on which El Comite was successful in obtaining a substantial portion of the formal relief sought—either through a court order or otherwise. In this regard the parties' attention is directed to *Keyes, supra,* at 400–401, which sets forth one possible procedure to be used to adjust the award to account for the extent to which the plaintiff did not prevail.

Second, due to the wide variety of activities performed by El Comite in representing the Hispanic community, a more specific breakdown of the services rendered is required here than in other civil rights cases. Again, *Keyes* is our guidepost. In order for us to evaluate the reasonableness of the number of hours expended in paralegal or nonlegal work, school board meetings, press relations, attendance at community meetings and other activities, and in order to determine a reasonable rate of compensation for these efforts, El Comite's fee application must specify the nature of the activity performed. See *Keyes, supra* at 408–413.

Finally, where a plaintiff-intervenor seeks compensation for its participation in the remedial stage of a desegregation case, the statutes "leave in the district court's hands full discretion to determine the extent to which a party's participation contributed to the resolution of the case and to adjust the award accordingly." *United States v. Board of Education of Waterbury, supra* at 577. To the extent that El Comite's positions have essentially duplicated those of plaintiff or other parties, El Comite's participation has not added significantly in the formulation of remedial measures, and the fee award must be reduced accordingly, according to the standards laid down in *King v. Greenblatt,* 1 Cir., 1977, 560 F.2d 1024. "[C]onvincing description of the division of labor must accompany reports of contemporaneous or identical work per-

---

**4.** We note that this approach has been rejected by the Sixth Circuit. *Northcross v. Board of* *Ed. of Memphis, supra,* at 635–636.

**416**

formed by several attorneys if deductions for duplication are to be avoided." *Furtado v. Bishop, supra,* 635 F.2d at 922. *Cf. Northcross v. Board of Education of Memphis, supra* at 636–37.

### PROCEDURAL ORDERS

In accordance with the principles outlined above, we order that, in addition to the number of hours expended and the requested rate of compensation, El Comite's fee application shall:

(1) Specify the number of hours spent on each major area of activity, e. g., 1974 Masters' hearings, parent groups, administrator and faculty desegregation, clustering of students for bilingual programs, other bilingual matters, etc.

(2) Specify the issues on which El Comite was successful, i. e., obtained the benefits sought in bringing the suit.

(3) Specify the nature of the activity involved, i. e., paralegal or nonlegal, attendance at school board meetings, press relations, attendance at community meetings, etc.

(4) Indicate those matters or issues where the position of El Comite essentially duplicated that of plaintiffs or some other party.

These tabulations, materials and specifications shall be filed within 30 days. The defendants and any other parties in interest shall have 20 days thereafter in which to file objections or comments. Then the parties shall explore the possibilities of settling some or all aspects of the matter, e. g., fair rates of compensation during various time periods for various attorneys and others involved.[5]

---

**5.** The parties' attention is invited to the pattern of settlement negotiations which led to a broad agreement regarding fees and costs claimed by counsel for the plaintiff class of black students and parents.

If settlement discussions reach an impasse, counsel shall notify the court and a further hearing will be scheduled.