**Arie Mack MOORE, Evanell E. Moore, Alfred L. Paulson and Mary E. Paulson, doing business as Eugene Granite & Marble Works, Plaintiffs-Appellees and Cross-Appellants,**

v.

**JAS. H. MATTHEWS & CO., et al., Defendants,**

and

**Rest Haven Memorial Association, West Lawn Memorial Park, Lane Memorial Gardens and Fir Grove Cemeteries Co., Defendants-Appellants and Cross-Appellees.**

Nos. 80–3180, 80–3217.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 14, 1981.

Decided July 29, 1982.

Rehearing and Rehearing En Banc Denied Oct. 8, 1982.

Laurence Hummer, Latham & Watkins, Los Angeles, Cal., for American Cemetery.

George L. Wagner, Portland, Or., argued, for Rest Haven Memorial; Spears, Lubersky, Campbell & Bledsoe, Portland, Or., on brief.

Jonathan T. Howe, Chicago, Ill., for amicus curiae Monument Bldg.

Edward R. Fechtel, Husband, Johnson, Fechtel & Goff, Eugene, Or., Roger G. Tilbury, Portland, Or., for Moore.

Before PREGERSON and BOOCHEVER, Circuit Judges, and HALBERT,[*] Senior District Judge.

BOOCHEVER, Circuit Judge:

This is the third time this private antitrust action involving the sale and installation of grave markers has come before this court. We conclude that the district court's decision on the installation tying claim is contrary to the law of the case and that the awards for damages and attorney fees were based on improper considerations without support in the record. Accordingly, for the third time, we reverse and remand for further proceedings.

## I

## Background

The action began in 1969 when Eugene Granite & Marble Works (EGM), Oregon's oldest retailer and installer of grave markers (a/k/a memorials and monuments), sued eight large "endowment care" cemeteries[1] in Lane County, Oregon and Jas. H. Matthews & Son, a national manufacturer of grave markers. EGM alleged that the defendants violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act by monopolization, attempted monopolization, refusal to deal, conspiracy, and two tie-ins. The tying claims stemmed from the cemeteries' requirements that a purchaser of a cemetery lot buy a grave marker only from the cemetery where the lot is purchased (sales tie), and that the marker be installed only by the cemetery where the lot and marker are purchased (installation tie).[2]

---

[*] Honorable Sherrill Halbert, Senior United States District Judge for the Eastern District of California, sitting by designation.

1. The distinguishing feature of an endowment care cemetery is that part of the purchase price of each cemetery lot is placed into a permanent trust to be used for the perpetual management and maintenance of the cemetery and any grave markers erected there. *See* Ore.Rev. Stat. §§ 97.810[1] and [7].

2. Briefly summarized, tying involves a seller's use of a dominant position in one product market to enhance its position in a separate product market by tying products from the two markets together for sale as a single unit at a single price. *Northern Pacific Ry. Co. v. Unit-*

The district court granted defendants summary judgment on all counts. This court reversed and remanded the case for trial. *Moore v. Jas. H. Matthews & Co.*, 473 F.2d 328 (9th Cir. 1973) (*"Moore I"*).

At the conclusion of the liability portion of the bench trial, the district court again entered judgment for all defendants on all counts. This court affirmed the district court's judgment on the monopolization, attempted monopolization, refusal to deal, and conspiracy counts, and as to the dismissal of defendant Jas. H. Matthews & Co., but again reversed the district court on both of EGM's tie-in claims. *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977) (*"Moore II"*). We concluded that "separate products and services are involved in each of the tying arrangements" and that the district court "erred as a matter of law" in upholding the cemeteries' quality control justification for the ties. 550 F.2d at 1215, 1218. We vacated the judgment on EGM's tie-in claims and remanded for further proceedings.

Following *Moore II*, three of the eight cemeteries settled with EGM and thereafter allowed EGM to sell and install markers on their properties. EGM and the remaining five cemeteries again went to trial on the tie-in claims.

The district court granted EGM judgment on the sales tying claim, but again held for the cemeteries on the installation claim. The district court found that the exclusive installation requirement was not an illegal tie because only a single product or service was involved. Having determined that installation was a part of a single product or service, the district court reasoned that the cemeteries' "justification defense" need not be discussed. Nevertheless, "for purposes of clarity," the court went on to state that the cemeteries' justification defense was meritorious because "in-

stallation guidelines simply would not work under the circumstances of this case."

The district court initially awarded EGM $31,128 in untrebled damages, but no costs or fees, and permanently enjoined defendants from engaging in the marker-sales tying practice. Both sides then moved to amend the judgment. The district court reopened proceedings, heard additional evidence, and issued a second decision awarding costs, trebled damages of $196,437, and attorney fees of $231,450.

Four of the five cemeteries affected by the judgment appeal, contending that the damage award was not supported by substantial evidence and that the award for attorney fees constituted an abuse of discretion because it was made without an adequate evidentiary record. EGM cross-appeals, claiming that the district court erred by rejecting the installation tying claim and that the awards for damages and fees were inadequate.

## II

### Law of the Case

The "law of the case" rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case. *See* IB *Moore's Federal Practice,* 0.404[1], at 404–09 (2d ed. 1980). *See also In re Staff Mortgage & Investment Corp.,* 625 F.2d 281, 282–83 (9th Cir. 1980); *Adamian v. Lombardi,* 608 F.2d 1224, 1228 (9th Cir. 1979), *cert. denied,* 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980). The law of the case principle is analogous to, but less absolute a bar than, *res judicata. Moore's Federal Practice, supra,* at 404–09. Although the law of the case rule does not bind a court as absolutely as *res judicata,* and should not be applied "woodenly" when doing so would be inconsistent with "consid-

---

ed States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958). Tying offends antitrust values because it denies competitors free access to the tied product market as well as limiting buyers' choices in the tied product market. This occurs not because the seller

imposing the arrangement is offering a superior product, but solely due to the leverage exerted by the tying product. *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 47 (9th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

erations of substantial justice,"[3] the discretion of a court to review earlier decisions should be exercised sparingly so as not to undermine the salutory policy of finality that underlies the rule. *See Lathan v. Brinegar*, 506 F.2d 677, 691 (9th Cir. 1974) (en banc); *United States v. Fullard-Leo*, 156 F.2d 756, 757 (9th Cir. 1946). The Fifth Circuit has aptly summarized the rule as follows:

> While the "law of the case" doctrine is not an inexorable command, a decision of a legal issue or issues by an appellate court establishes the "law of the case" and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

*White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir. 1967).

In *Moore II*, we vacated the judgment against EGM on the tie-in claims, and originally remanded the case "for further proceedings consistent with this opinion." In denying the cemeteries' petition for rehearing and rehearing en banc, however, the court amended the remand language to read: "the case is remanded for further proceedings *and factual determinations* consistent with *the standards articulated in*

this opinion." 550 F.2d at 1220. (Emphasized language was added by the amendment.)

The district court believed that prior to being amended, *Moore II* "left only the amount of damages and some sort of injunctive relief" for determination on remand. It evidently considered, however, that the amendment to *Moore II* somehow expanded the scope of remand to require having all the tying issues fully relitigated.

The district court's interpretation of our remand was erroneous and its disposition of the installation tying claim was directly contrary to *Moore II*. Review of the eight-page discussion of tying in *Moore II* indicates that the district court's alternative grounds for rejecting the installation tying claim were not among the "matters left open by the mandate of this court." *Quern v. Jordan*, 440 U.S. 332, 347, 99 S.Ct. 1139, 1148, 59 L.Ed.2d 358 n. 18 (1979). The only issues left for determination by *Moore II* were on damages, attorney fees, and, as indicated in note 4, *infra*, the ties' effect on interstate commerce in the tied market. We believe that it was with these issues in mind that the court amended its remand.

██ We commenced our discussion of tying in *Moore II* by noting that both the sales and the installation tying claims were under consideration and that all four cemeteries involved in the present (third) appeal engaged in both practices. 550 F.2d at 1212. The court noted that the first question under tying analysis[4] is whether there

---

**3.** *United States v. Imperial Irrigation District*, 559 F.2d 509, 520 (9th Cir. 1977), *modified on other grounds*, 595 F.2d 524, *reversed in part, vacated in part, both on other grounds, sub nom. Bryant v. Yellen*, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980).

**4.** Three criteria must be satisfied to demonstrate an illegal tying arrangement:

> First, there must in fact be a tying arrangement between two distinct products or services. Second, the defendant must have sufficient economic power in the tying market to impose significant restrictions in the tied product market. Third, the amount of commerce in the tied product must not be insubstantial.

*Moore II*, 550 F.2d at 1212 (citations omitted). The second and third criteria—neither of which

was a basis for the district court's rejection of the installation tying claim—merit brief consideration. Neither factor supports the cemeteries' contentions or warrants a remand.

The second criteria—market power in the tying product—may be shown by product uniqueness or desirability, a requirement we found satisfied in *Moore II*. 550 F.2d at 1215. On remand, the district court also found that the cemeteries possessed the requisite degree of market power in the tying market of grave lots. Although this finding was made in regard to the sales tying claim, it is equally applicable to the installation claim, and is supported by substantial evidence.

To satisfy the third criteria—proof of an effect on interstate commerce in the tied market—the challenged restraint must implicate more than a *de minimis* amount of interstate

are "separate and distinct products or services tied into a single package." *Id.* at 1214. After a lengthy analysis of the applicable case law, we concluded that:

> An application of the factors in [*Fortner Enterprises, Inc. v. United Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)] *Fortner I* and our consideration of the "function of the aggregation" *leads inescapably to the conclusion that separate products and services are involved in each of the tying arrangements before us.*

*Id.* at 1215 (emphasis added).

■ We later noted that, "[i]n addition to their contention that only a single product is involved here, [the cemeteries] offer [two] justifications for the tying arrangements." *Id.* at 1217. The first justification was a "goodwill and quality control argument," and the second justification was a "regulated industry [state action] defense." *Id.* at 1217, 1218. The court expressly rejected both justifications, noting, in regard to the first justification, that the cemeteries' legitimate concerns about quality and customer goodwill could be adequately maintained by specifications. 550 F.2d at 1217. Any doubt about our holding on the justification issue should have ended with our statement that the district court "erred as a matter of law in recognizing the reasonableness of the tie-in restrictions." *Id.* at 1218.

The district court nevertheless rejected EGM's installation claim because it thought that separate products and services were not involved and that, even if they were, the cemeteries' installation practices were justified by quality control concerns. The amended remand cannot be construed to erase this court's unequivocal conclusion that "separate products and services are involved in each of the tying arrangements"

and that the district court "erred as a matter of law" in upholding the cemeteries' quality control justification. 550 F.2d at 1215, 1218.

Moreover, none of the limited exceptions to the law of the case rule is applicable here. *See United States v. Imperial Irrigation District*, 559 F.2d at 520; *White v. Murtha*, 377 F.2d at 431–32. The evidence developed on remand offered even stronger support than this court had available in *Moore II* for holding that marker installation is a separate service, and the cemeteries point to no contrary controlling authority or considerations of substantial justice that warrant reconsidering the law of this case.

### III

### Damages

The trial court prefaced its discussion of the damage issue by criticizing the cemeteries for not being as helpful as EGM in supplying a theory for calculating damages from the sales tie. The court noted that "[i]n spite of the principal ruling of the Court of Appeals, [the cemeteries] continue to insist simply that there were no damages." The court then proceeded to discuss EGM's proof, which the court characterized as the only "reasonable theory for calculating damages." EGM's proof consisted primarily of the testimony and reports of Dr. Reinmuth, Dean of the Business School at the University of Oregon. Dr. Reinmuth based his testimony and reports on evidence in the record, including both sides' business records and interment data supplied by the State of Oregon. Dr. Reinmuth divided EGM's alleged damages from the sales tying claim into three categories (termed "Types 1–3" by the parties and trial court).

commerce in the tied product or service. *Moore II*, 550 F.2d at 1216. Although neither *Moore II* nor the district court's decision can be construed as having directly decided the issue, our review of the record indicates that it would be unfair to all concerned to remand the tying claims a third time on this issue. The effect-on-commerce criteria was clearly satisfied in regard to the sales tie. The cemeteries sold

over 2 million dollars worth of markers between 1965 and 1978, virtually all of which originated from outside Oregon. Although admittedly a closer question, the record also demonstrates that sufficient lumber, nails, concrete, and other construction materials originating from outside Oregon were used in the hundreds of marker installations at issue in this case to satisfy the criteria as a matter of law.

Because EGM does not contest the district court's rejection of Type 3 damages as overly speculative, we do not discuss them.

Type 1 damages reflect the per-marker decrease in the average selling price EGM obtained for the few markers it sold for placement in the defendant cemeteries (effect on price). Type 2 damages were the profits EGM allegedly lost from being shut out from a representative share of the marker market in the defendant cemeteries (effect on market). Dr. Reinmuth based his calculation of Type 2 damages on the assumption that, but for the illegal sales tie, EGM would have sold the same percentage (50%) of markers in the defendant cemeteries as it did in other local cemeteries, including the three cemeteries that settled following *Moore II.*

The trial court reduced Dr. Reinmuth's Type 2 estimate of damages by fifty percent because the trial judge had a low opinion of EGM's manager, Arie Mack Moore. In the trial judge's words:

I have observed Arie Mack Moore throughout these proceedings. He is given to gross overstatements. I believe that on an average he has exaggerated his loss data by one hundred percent. Furthermore, the evidence has shown that his marker installations have been done in a less than workmanlike manner. His sales techniques have been poor. He is often arrogant. His personality is such that his sales would not be as high as a more reasonable dealer. For these factors, I reduce the expert's estimated lost sales figures by fifty percent.

The cemeteries contend that the district court erred in awarding any Type 1 and 2 damages. EGM contends that the judge erred in reducing the Type 2 damages solely because of his adverse impression of EGM's manager, but does not contest the amount of Type 1 damages awarded.

■ The well-settled rules applicable to proving antitrust damages were summarized in *Knutson v. Daily Review, Inc.,* 548

F.2d 795, 811–12 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), where this court stated:

The Supreme Court has also established a relaxed standard for proving the amount of damages in an antitrust case once the fact of damage has been shown.... "It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." `[citations omitted]

A study of the adjudicated cases in this area readily dispels any impression that this question of damages is governed by an application of the common law rule of reasonable certainty. The cases have long since departed from this rule in antitrust litigation.

*Accord, Greyhound Computer Corp. v. IBM,* 559 F.2d 488, 505–07 (9th Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). In other words, an antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations. *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

■ In light of the liberal proof-of-damages rule in antitrust cases, the cemeteries' continued insistence that EGM is entitled to no damages is meritless. Although EGM's proof may have lacked exactness, it was certainly within the liberal bounds permitted in antitrust cases.

There was ample evidence to support the assumptions underlying Dr. Reinmuth's calculations. For instance, there was evidence that the cemeteries' restrictive policies compelled EGM to charge less for the few markers it sold for placement in the defendants' cemeteries than it otherwise would have (Type 1 damages). There was also evidence that, but for the tying restraints, EGM would have sold approximately 50% of the markers sold in defendants' cemeteries (Type 2 damages).[5] Given the cemeteries'

---

5. Although EGM sold only about 4% of the markers placed in the defendant cemeteries,

the company sold and installed approximately 50% of the markers placed in those Lane Coun-

repeated refusal to assist the district court in arriving at a fair calculation of damages, they are in no position to argue that Dr. Reinmuth's use of inexact figures rendered his damage calculations fatally speculative.

■ The district court's rationale for reducing EGM's Type 2 damages is meritless. Although Dr. Reinmuth relied to a limited extent on business records and other information supplied by Moore, the bulk of his damage calculations were based on independent data in the record. The district court's opinion of Moore's personality and ability were improper reasons for reducing damages because Moore did not make the calculations or supply the critical data upon which the calculations were based. Even assuming that the district court's assertions about Moore were accurate, those factors would have adversely affected the past sales in the unrestricted cemeteries that Dr. Reinmuth used as the basis for his damage projections. Thus, if Moore's business abilities had been greater, EGM would theoretically have made an even greater percentage of the sales in unrestricted cemeteries which, in turn, would have actually increased Dr. Reinmuth's estimate of Type 2 damages. In short, neither the district court nor the cemeteries have offered a sound reason why EGM's Type 2 damages should have been arbitrarily reduced by fifty percent.

Accordingly, we affirm the award of Type 1 damages, order the award of Type 2 damages to be doubled to the full amount proven by EGM, and remand for the district court to determine and award additional damages attributable to the illegal installation tie.[6]

## IV

### Attorney Fees

On May 22, 1979, EGM filed a request for fees supported by affidavits. The parties entered a stipulated order on June 4, 1979, providing that no discovery or hearing would be held on attorney fees pending the court's reconsideration of the damage issue.

On February 4, 1980, the district court issued its amended decision. In addition to awarding EGM the damages discussed above, the court awarded attorney fees of $231,450 pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 (mandating the award of "a reasonable attorney's fee" to prevailing antitrust plaintiffs).

In its one-paragraph discussion of attorney fees, the trial court stated that it reduced the number of hours requested by two of EGM's three principal attorneys by fifty percent because they "were . . . inclined to produce a large volume of less than useful material." The court then multiplied the approved number of hours by fifty dollars per hour. The court felt fifty dollars per hour was "reasonable compensation for each attorney."

The cemeteries argue that the district court abused its discretion by awarding attorney fees without an adequate evidentiary basis.[7] The cemeteries contend that the

---

ty cemeteries that lacked restrictive practices. The cemeteries vigorously argued that the other cemeteries, none of which were endowment care cemeteries like the defendants, were inaccurate comparables. The defendants offered no explanation, however, for why EGM's sales increased to almost 50% at each of the three settling endowment care cemeteries following their discontinuation of the challenged exclusivity requirements.

**6.** We note that the calculation of installation damages can be made from the evidence already in the record. Because EGM's damage evidence was offered before the district court ruled on the tying claims, it necessarily included damages attributable to both ties. Indeed, proceeding on the assumption that both the

sales and the installation restraints had been held illegal in *Moore II*, Dr. Reinmuth originally made no attempt to compute separately the damages from the two ties. It was not until after the district court upheld the installation tie and agreed to reopen proceedings to hear additional evidence on damages that Dr. Reinmuth separated the two charges. This was done, as the district court requested, using the information already in evidence.

**7.** The district court denied the cemeteries' motion to reopen the amended decision in regard to damages and attorney fees. The judge observed that the "award of damages that I would have made except for that mandate from the Court of Appeals [*Moore II*] would have

838

district court's handling of the matter unfairly deprived them of an opportunity to show that some of the hours requested by EGM's attorneys were spent on matters they were not entitled to be reimbursed for. Specifically, the cemeteries contend that they would have demonstrated that EGM sought fees for time spent prosecuting the non-tying claims that EGM did not prevail on, as well as for time devoted to prosecuting claims against those defendants that settled or were dismissed from the case.

EGM also claims that the fee award constituted an abuse of discretion. EGM argues that: (1) it was unreasonable for the district court to reduce the number of hours claimed by the two EGM attorneys by fifty percent, without reference to any legal standards, solely because the court thought they produced some "less than useful material;" and (2) the multiplier of $50 per hour was unreasonably low for experienced antitrust lawyers handling such a major and protracted litigation on a contingency fee basis.

Both sides are correct. The district court's failure to allow the parties to develop an adequate evidentiary basis for a fee award and to follow proper standards in awarding fees was inconsistent with the sound exercise of discretion.[8]

Given the stipulated order, the paucity of information available to the district court on the issue, and the substantial amount of money involved, the district court should not have awarded fees on such an inadequate evidentiary basis. Although a hearing on fees may be unnecessary when the affidavits and briefs submitted by the parties are sufficiently detailed to provide a basis for the award, *see Manhart v. City of Los Angeles, Department of Water and Power*, 652 F.2d 904, 908 (9th Cir. 1981); *Williams v. Alioto*, 625 F.2d 845, 849 (9th Cir. 1980), *cert. denied*, 450 U.S. 1012, 101

S.Ct. 1723, 68 L.Ed.2d 213 (1981), the district court clearly lacked an adequate evidentiary basis here for awarding fees. Had the district court been properly guided by the standards discussed below for setting attorney fees, the need to obtain more information on which to base a fee award would have been apparent. *See Perkins v. Standard Oil Co.*, 399 U.S. 222, 223, 90 S.Ct. 1989, 1990, 26 L.Ed.2d 534 (1970); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 169 (3d Cir. 1973).

Among the factors that should be considered in awarding fees are: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill necessary to perform the legal services properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relations with the client, and (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), adopted by this circuit in *Kerr v. Screen Extras Guild Inc.*, 526 F.2d at 69–70.

This court has repeatedly held that it is an abuse of discretion for a district court to award fees without considering these guidelines (known as the "*Kerr* guidelines"). *See, e.g., Higgins v. Harden*, 644 F.2d 1348, 1352 (9th Cir. 1981); *Ellis v. Cassidy*, 625 F.2d 227, 231 (9th Cir. 1980). Although not all twelve *Kerr* guidelines need be considered in every case, *see Manhart*, 652 F.2d at 907; *Kessler v. Associates Financial Services Co.*, 639 F.2d 498, 500 n.1 (9th Cir. 1981), the need for meaningful review requires remand where, as here, the record on

been zero," and that "one reason the attorney's fees was low is that the amount of the [damage] award is too high."

**8.** This court will not disturb a district court's award of attorney fees absent an abuse of discretion. *See, e.g., O'Neil v. City of Lake Oswego*, 642 F.2d 367, 370 (9th Cir. 1980); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69 (9th Cir. 1975), *cert. denied sub nom.*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

appeal fails to indicate which, if any, of the *Kerr* guidelines were considered. *Harmon v. San Diego County*, 664 F.2d 770 at 772 (9th Cir. 1982) (as amended); *Fountila v. Carter*, 571 F.2d 487, 496–97 (9th Cir. 1978).

██ The rationale underlying the district court's award is clearly inadequate. Three attorneys have handled the bulk of EGM's work during the eleven years this case has been litigated. These attorneys documented having spent approximately seven-thousand hours working on the case.[9] All three attorneys have distinguished backgrounds and extensive experience in antitrust work. In handling this case on a contingency basis for over eleven years, through three trials, and now three appeals, EGM's attorneys have taken an enormous risk. For the district court to reduce the attorneys' hours by half and allow less than one-half of their normal billing rate solely because it thought they produced some less than useful material[10] was an abuse of discretion.

██ While we do not infer that there should be either an increase or decrease in fees, we remand the question with directions that the court gather additional evidence, make a new award, and substantiate its award consistent with this opinion. In calculating the new award, the district court should consider the time EGM's attorneys spent in successfully prosecuting the three appeals.[11]

To minimize the possibility of misunderstanding, we offer the following additional guidance on remand. First, the district court should examine the merits of the cemeteries' contention that EGM's attorneys are not entitled to reimbursement for time they spent working on unsuccessful claims and matters pertaining to defendants that settled or were dismissed from the case in light of our recent decision in *Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291 at 1312–1314 (9th Cir. 1982). *See also Rivera v. City of Riverside*, 679 F.2d 795 at 796–797 (9th Cir. 1982); *Thornberry v. Delta Air Lines, Inc.*, 676 F.2d 1240 at 1243 (9th Cir. 1982). We articulated the following test in *Twin City* for determining when an antitrust plaintiff is entitled to fees for work related to the pursuit of both successful and unsuccessful claims:

> [A] prevailing antitrust plaintiff is entitled to recover a reasonable attorney's fee for every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest in the pursuit of a successful recovery of anti-trust damages.

676 F.2d at 1313

Second, our decision should not be construed as mandating inflexible application of the *Kerr* criteria. Courts and commentators alike have criticized rigid application of the *Kerr* guidelines. *See, e.g., Copeland v. Marshall*, 641 F.2d 880, 890 (D.C.Cir.1980) (en banc); *In Re Capital Underwriters, Inc. Securities Litigation*, 519 F.Supp. 92, 99 (N.D.Cal.1981); *Stanford Daily, Inc. v. Zurcher*, 64 F.R.D. 680 at 682; Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U.Pa.L.Rev. 281, 286–87 (1977). This criticism is directed principally at the redundancy among the guidelines[12]

---

**9.** Given that this case has generated three appeals, the staggering number of claimed attorney hours is not, on its face, out of line with claims made in other complex antitrust cases. *See generally* Comment, *Attorneys' Fees in Individual and Class Action Antitrust Litigation*, 60 Cal.L.Rev. 1656, 1679–82 (1972) (Appendix—Table of fee awards in antitrust cases).

**10.** Our review of the voluminous record discloses no evidence to support the district court's finding that only half of the work by EGM's attorneys was sufficiently "useful" to warrant reimbursement. Much of the work that we might otherwise consider marginally useful was a necessary response to the numerous motions and defenses made by the cemeteries.

**11.** Time spent on appeal may be included in a fee award under section 4 of the Clayton Act. *Perkins v. Standard Oil Co. of California*, 474 F.2d 549, 553 (9th Cir.), *cert. denied*, 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400 (1973); *Knutson v. Daily Review, Inc.*, 479 F.Supp. 1263, 1273 (N.D.Cal.1979).

**12.** For example, consideration of the "difficulty of the questions" should be subsumed under "time and labor required," while factors con-

and the fact that they lack a practical framework for application.[13]

An alternative approach to calculating fee awards, termed "lodestar" analysis, involves the calculation of a "lodestar" figure based on multiplying the number of hours expended by counsel times the prevailing billing rate for comparable legal services in the community. Unless counsel is working outside his or her normal area of practice, the billing-rate multiplier is, for practical reasons, usually counsel's normal billing rate. Billing rates usually reflect, in at least a general way, counsel's reputation and status (*i.e.*, as partner, associate, or law clerk). The relatively objective lodestar figure is then adjusted based on the quality and risk involved in counsel's efforts.

Lodestar analysis was originally articulated by the Third Circuit in *Lindy Bros.*, 487 F.2d at 167–69, and, following remand, 540 F.2d 102, 112–18 (3d Cir. 1976), and has since been adopted and refined in a number of other circuits.[14] This court has adhered to the *Kerr* guidelines and has yet to directly approve the use of straight lodestar analysis.[15] Like the *Kerr* guidelines, lodestar analysis has been subject to criticism. Its critics contend that lodestar's emphasis on hours and billable rates woodenly inflates awards. *See, e.g., In re Capital Underwriters, Inc. Securities Litigation*, 519 F.Supp. at 99; *Stanford Daily v. Zurcher*, 64 F.R.D. at 682.

We note with approval that district courts in this circuit have increasingly responded to the perceived flaws in the *Kerr* and lodestar approaches by blending the best features of the two approaches. *See, e.g., In re Capital Underwriters, Inc. Securities Litigation*, 519 F.Supp. at 100; *Keith v. Volpe*, 86 F.R.D. 565, 573–77 (C.D.Cal.1980); *Donnarumma v. Barracuda Tanker Corp.*, 79 F.R.D. 455 (C.D.Cal.1978); *Lockheed Minority Solidarity Coalition v. Lockheed Missiles & Space Co.*, 406 F.Supp. 828 (N.D.Cal. 1976); *Stanford Daily v. Zurcher*, 64 F.R.D. at 682. This court recently upheld a fee award calculated with a blend of lodestar and *Kerr* analysis. *Thornberry v. Delta Air Lines, Inc.*, at 1242–1243. Although—consistent with the broad discretion accorded district courts in awarding fees—the "blended" approach taken in each of these cases differs slightly in response to the particular facts at issue, the common characteristic is the use of lodestar analysis as "a procedure for ordering the examination of [the] factors listed in [*Kerr*]." *In re Capital*, 519 F.Supp. at 100 and *Knutson*, 479 F.Supp. at 1270 n.10, quoting with approval, *Zurcher*, 64 F.R.D. at 682. As noted in *In re Capital*, the courts utilizing a blended approach:

> generally begin by equating the first factor in the lodestar approach, "hours spent," with the "time and labor required" element of [*Kerr*] ..., then consider other [*Kerr*] factors in setting the hourly rate and determining whether to

---

cerning the level of skill required for the services, the fixed or contingent nature of the fee, time limitations, the amount to be obtained, the reputation of counsel, and the undesirability of the case, are all elements to be considered in setting the customary hourly fee. *Copeland v. Marshall*, 641 F.2d at 890.

**13.** *Kerr*'s laundry-list of factors "offers no guidance on the relative importance of each factor, whether they are to be applied differently in different contexts, or indeed, how they are to be applied at all." Berger, *supra*, at 286–87.

**14.** *See, e.g., Copeland v. Marshall*, 641 F.2d at 890–94; *Furtado v. Bishop*, 635 F.2d 915, 919–20 (1st Cir. 1980); *Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977); *Grunin v. International House of Pancakes*, 513 F.2d 114, 128–29 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

**15.** *But see Brandenburger v. Thompson*, 494 F.2d 885, 890 n. 7 (9th Cir. 1974), a pre-*Kerr* decision, in which we remanded a civil rights action for an award of attorney fees in light of *Johnson v. Georgia Highway Express, Inc.*, *supra*, *Kerr*'s Fifth Circuit predecessor, and *Lin-*

augment or decrease the award based on quality or contingency considerations.

519 F.Supp. at 100.[16]

We believe that the blended approach is well suited to the facts of this case, and commend it to the district court for use in calculating the fee award on remand.

## V

### Conclusion

The district court's decision on the installation tying claim is reversed. In regard to damages, we affirm the award of Type 1 damages, order the award of Type 2 damages doubled, and remand for the additional award of damages attributable to the illegal installation tie. Finally, we vacate the district court's award of attorney fees and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.

*dy I*, the Third Circuit's origination of lodestar analysis.

**16.** The "contingency considerations" referred to in the above quote are three-fold:

  1. Analysis of plaintiff's burden—considering the legal and factual complexity of the case, the probability of defendant's liability, whether damages would be difficult or easy to prove;

  2. Risks assumed in developing the case—number of hours and out-of-pocket expenses risked without guaranteed compensation; and

  3. Delay in receipt of payment for services rendered.

*Knutson*, 479 F.2d at 1277, paraphrasing *Lindy*, 540 F.2d at 117. The second contingency consideration—the risks assumed—is similar to the sixth *Kerr* guideline, requiring inquiry into the fixed or contingent nature of the fee. Parti-

cularily in cases not involving a potential for substantial monetary recovery, an enhanced fee due to its contingent nature may be justified. Awards should not automatically be increased, however, merely because there are risks associated with contingent fee arrangements. In fee-generating cases where a large damage recovery is likely, the contingent fee arrangement, by its very nature, helps compensate the attorneys for the risks involved. This can be especially true in antitrust cases where treble damages are available. The fee, based on a percentage of the total recovery, may be generous, yet the plaintiff in such situations may recover even more than actual damages after paying such fee. Further, the deterrent effect on the defendant should adequately be accomplished by assessing treble damages plus a normal attorney's fee without enhancement for its contingency under those circumstances.