Harry LEWIS, et al., Plaintiffs,

v.

Leo T. HEGSTROM, et al., Defendants.

Civ. No. 82–946–RE.

United States District Court,
D. Oregon.

Dec. 30, 1983.

Michael H. Marcus, Legal Aid Service, Portland, Or., for plaintiffs.

Dave Frohnmayer, Atty. Gen., John R. McCulloch, Jr., Chief Trial Counsel, Robert W. Muir, Asst. Atty. Gen., Salem, Or., for defendants.

OPINION

REDDEN, Judge:

This is a class action in which plaintiffs attack the validity of a proposed state administrative rule defining the period of ineligibility of an applicant for Medicaid who has transferred his or her home for less than fair market value. Plaintiffs contend that the proposed regulation conflicts with

a controlling federal statute. Plaintiffs have also moved for an order awarding them reasonable attorneys' fees.

## I. *The Proposed Administrative Rule*

*Background*

The plaintiff class includes all applicants for Medicaid whose applications were denied between July 1, 1981 and May 13, 1983 based upon a determination that they possessed excess resources due to the transfer of their home after July 1, 1981. Defendants are the Director of the Oregon Department of Human Resources and the Administrator of the Oregon Adult and Family Services Division. Under Oregon law, the Director of the Department of Human Resources is responsible for supervising various programs, including medical services provided through the Adult and Family Services Division. The Administrator of the Adult and Family Services Division is responsible for supervising the administration of the Medicaid program in Oregon.

Plaintiffs brought this suit in July 1982. Originally they contended that Oregon statutes and administrative rules violated 42 U.S.C. §§ 1382b(c) and 1396a(j). On August 19, 1982, Congress passed the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), which in part modified the criteria for Medicaid eligibility. TEFRA took effect September 3, 1982. The parties subsequently entered into a Consent to Judgment and Decree essentially providing plaintiffs with the relief they had initially sought. The parties have reached agreement on a set of administrative rules, with one exception: proposed Or.Admin.R. 461-04-070(6)(e).

*Discussion*

### A. *The Medicaid Program*

Medicaid is a cooperative federal-state program designed to provide medical assistance to families with dependent children and aged, blind or disabled persons without sufficient resources for such medical care. A state that desires to participate in the Medicaid program must develop a plan that meets the approval of the Department of Health and Human Services. If a plan is approved, the state is reimbursed for a portion of the dollars it spends.

Each state determines the rates at which it will reimburse facilities for the medical care provided. The rates are subject to approval by the Secretary of Health and Human Services. 42 U.S.C. § 1396a(13)(A) (Supp.1975–1982). Federal regulations provide detailed guidelines. 42 C.F.R. § 447.-252, 42 C.F.R. § 447.272, 42 C.F.R. part 405, subpt. D (1982).

In Oregon, facilities submit financial statements which the state reviews and ranks for each type of facility based on their total per diem cost. The State has established the 75th percentile ranking as the maximum rate at which a facility may be reimbursed. Or.Admin.R. 411–70–440 (1983). Each facility is reimbursed for its "actual allowable costs," but only to the maximum rate. Or.Admin.R. 411–70–450. Facilities may be reimbursed at a special rate for "heavy cost care" to persons in need of greater care. Or.Admin.R. 411–70–30.

The average reimbursement rate for all participating facilities is $1350. Medicaid recipients must contribute to their care all of their income beyond a minimal amount they are permitted to retain for personal needs. Or.Admin.R. 411–70–095. These contributions reduce the amount actually paid by the State of Oregon to an average of $1000 per month.

■ Despite federal standards, each state has wide discretion in the administration of its local program. *Dawson v. Myers,* 622 F.2d 1304 (9th Cir.1980), *vacated on other grounds,* 451 U.S. 625, 101 S.Ct. 1961, 68 L.Ed.2d 495 (1981). Once a state decides to participate in the Medicaid program it must comply with the requirements of Title XIX of the Social Security Act (42 U.S.C. § 1396 *et seq.* (1974 ed. and Supp.1975–1982)). *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). State regulations inconsistent with controlling federal laws and

regulations are invalid. *Franssen v. Juras,* 406 F.Supp. 1375 (D.Or.1975).

### B. *Statutory Interpretation*

■■■ A court's interpretation of a statute begins with the language itself. *Donovan v. Southern California Gas Co.,* 715 F.2d 1405, 1407 (9th Cir.1983). If the language of a statute is unambiguous, the court need look no further. *Green v. Commissioner of Internal Revenue,* 707 F.2d 404, 405 (9th Cir.1983). If, however, the language is ambiguous, the court must examine the statute's legislative history in order to determine Congress' intent in enacting the statute. *Id.*

### 1. *The Statutory Language*

Prior to the enactment of TEFRA, state rules denying Medicaid applications on grounds of such transferred assets could not be more restrictive than the procedure set forth in 42 U.S.C. § 1382b(c). 42 U.S.C. § 1396a(j) (Supp.1975–1981). That procedure established that any resource transferred for less than fair market value within the 24 months preceding the application for benefits was deemed a resource for the purpose of establishing eligibility for Medicaid if made to render an applicant eligible for benefits. 42 U.S.C. § 1382b(c)(1) (Supp. 1975–1981). Any such transfer was presumed to have been made in order to establish eligibility, and that presumption could only be rebutted by "convincing evidence." 42 U.S.C. § 1382b(c)(2). Homes were excluded from this requirement. 42 U.S.C. § 1382b(a)(1).

TEFRA made the home countable as a resource under certain circumstances. 42 U.S.C. § 1396p(c)(2)(B) (Supp.1975–1982) provides that:

(i) [i]n the case of any individual who is an inpatient in a skilled nursing facility, intermediate care facility, or other medical institution, if such individual is required, as a condition of receiving services in such institution under the State plan, to spend for costs of medical care all but a minimal amount of his income required for personal needs, and, who, at any time during or after the 24-month period immediately prior to application for medical assistance under the State plan, disposed of a home for less than fair market value, the State plan (subject to clause (iii)) may provide for a period of ineligibility for medical assistance in accordance with clause (ii).

(ii) If the State plan provides for a period of ineligibility under clause (i), such plan—

(I) shall provide that such individual shall be ineligible for all medical assistance for a period of 24 months after the date on which he disposed of such home, except that, in the case where the uncompensated value of the home is less than the average amount payable under the State plan as medical assistance for 24 months of care in a skilled nursing facility, the period of ineligibility shall be such shorter time as bears a reasonable relationship (based upon the average amount payable under the State plan as medical assistance for care in a skilled nursing facility) to the uncompensated value of the home, and

(II) may provide (at the option of the State) that, in the case where the uncompensated value of the home is more than the average amount payable under the State plan as medical assistance for 24 months of care in a skilled nursing facility, such individual shall be ineligible for all medical assistance for a period in excess of 24 months after the date on which he disposed of such home which bears a reasonable relationship (based upon the average amount payable under the State plan as medical assistance for care in a skilled nursing facility) to the uncompensated value of the home.

(iii) An individual shall not be ineligible for medical assistance by reason of clause (ii) if—

(I) a satisfactory showing is made to the State (in accordance with any regulations promulgated by the Secretary) that the individual can reasonably be

expected to be discharged from the medical institution and to return to that home.

(II) title to such home was transferred to the individual's spouse or child who is under age 21, or (with respect to States eligible to participate in the State program established under subchapter XVI of this chapter) is blind or disabled as defined in section 1382c of this title,

(III) a satisfactory showing is made to the State (in accordance with any regulations promulgated by the Secretary) that the individual intended to dispose of the home either at fair market value, or for other valuable consideration, or

(IV) the State determines that denial of eligibility would work an undue hardship.

Proposed Or.Admin.R. 461–04–070(6)(e) is based on the state's interpretation of the language in subsections (B)(ii)(I) and (B)(ii)(II). The proposed regulation states that

[f]or the purpose of this section, the period of ineligibility shall last for one month for every full $1,000 of uncompensated value beginning with the first month in which Title XIX medical assistance payments would be payable to the skilled nursing facility, intermediate care facility or medical institution.

Thus, the period of ineligibility would be based on the amount the state would otherwise be paying for each Medicaid recipient, less the amount contributed by the recipient. Plaintiffs challenge this construction of the federal statute. They argue that the period of ineligibility must be based on the total average amount paid the providing facilities, or $1350 per month. What is at stake is the duration of the period of ineligibility. For example, the transfer of a home for $27,000 less than fair market value, would result in a 27 month period of ineligibility under the proposed regulation, but only 20 months if plaintiffs are correct.

The relevant language in 42 U.S.C. § 1396p(c)(2)(B)(ii) requires that the period of ineligibility bear "a reasonable relationship (based upon the average amount payable under the State plan as medical assistance for care in a skilled nursing facility) to the uncompensated value of the home." Although this language plainly contemplates that states will have leeway in making their calculations, the question is whether Oregon may treat the "average amount payable" as the average amount it actually pays for each Medicaid recipient.

It is significant that the statute uses the word "payable," rather than "paid." The statute's focus is on the amount for which facilities are entitled to reimbursement by the state rather than on the amount actually paid out by the state. The statute's language indicates that the period of disqualification should be based on the average of the reimbursement rates the state has determined to be appropriate, *not* on the amount that the state actually pays because Medicaid recipients contribute part of the cost of the medical services provided. On its face, the statute is more consistent with plaintiffs' interpretation than that of defendants. Because the language is somewhat ambiguous, however, I consider the legislative history of this law.

## 2. *The Legislative History*

The provision of TEFRA at issue in this case originated in a Senate Finance Committee amendment. That amendment provided that states could: (1) attach the real property—including the home—of permanently institutionalized Medicaid recipients and (2) deny eligibility to applicants who had transferred their home for less than fair market value under certain circumstances. S.Rep. No. 97–494, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 781, 814.

The Committee expressed a concern that under then-existing law an individual could transfer his or her home to a friend or relative without risking a denial of Medicaid eligibility. *Id.* The Committee stated that its amendment

intends to assure that all of the resources available to an institutionalized

individual, including equity in a home, which are not needed for the support of a spouse or dependent children will be used to defray the costs of supporting the individual in the institution.

*Id.*

The Finance Committee amendment provided that states could deny eligibility for: (1) a period "bearing a reasonable relationship to the uncompensated value of the home," or (2) a minimum of 24 months, and longer where the uncompensated value of the home exceeded the "maximum amount payable under the State plan as medical assistance for 24 months of care in a skilled nursing facility." 128 Cong.Rec. S8586 (daily ed. July 19, 1982).

The conference agreement on the provision followed the Senate version, but modified it to relate the period of ineligibility to the uncompensated value of the home in all cases. The House Conference Report explains the result only by saying that "the period of eligibility delay must be related to the uncompensated value of the home, based on the beneficiary's equity, and the cost of medicaid benefits." H.Conf.Rep. No. 97–760, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 1190, 1218.

 The legislative history reveals that Congress intended to change the previous policy with respect to the transfer of applicants' homes. Congress sought to create a disincentive to the transfer of a home, in order to ensure that more resources be available to the government to defray the cost of Medicaid. Neither the discussion in the Senate Finance Committee Report nor the House Conference Report demonstrates an intent to tie the period of ineligibility to the amount actually paid to the provider of medical services by the state.

Defendants maintain that "the cost of medicaid benefits" mentioned in the House Conference Report refers to the cost to the state. The phrase, however, could as easily refer to the total cost of benefits provided by the facility. It does not demonstrate a congressional intent to take individual contributions into account.

Defendants argue that the purpose of the federal statute is to permit the state to constructively recover the uncompensated value of the transferred home. They argue that plaintiffs' interpretation would enable ineligible individuals to get credit for money—$350 out of $1350—that they would never have received, because they would have paid that portion out of other resources. The legislative history, however, does not support the contention that the state is entitled to recover the entire uncompensated value of a transferred home. The purpose of the statute is simply to prevent transfers made for the purpose of reducing the state's ability to recover costs.

Defendants do not dispute that one contemplating the transfer of a home before applying for Medicaid faces substantial disincentives. Those without Medicaid apparently pay substantially more for the same care than Medicaid recipients. An individual who transfers a home for fair market value may "spend down" to become eligible for Medicaid, regardless of where or how fast the money goes. An individual affected by this statute will be ineligible for a given period, based on the uncompensated value of the transferred home. Thus, the interpretation of the statute urged by plaintiffs does not defeat Congress' purpose in enacting it.

Legislative history does not support defendants' interpretation. Defendants contend that even if their suggested procedure would be punitive, that is exactly what Congress intended. Congress' intent, however, was to prevent Medicaid applicants from disposing of their homes in order to short-change the government. The clearest indication of how to calculate the period of ineligibility is the language of the statute itself. The logical reading of that language supports plaintiffs' position.

## II. *Attorneys' Fees*

Plaintiffs have moved for an order awarding them reasonable attorneys' fees as well as their costs and disbursements,

pursuant to 42 U.S.C. § 1988 (1981 and 1983 Supp.) and paragraph VII of the CONSENT TO JUDGMENT AND DECREE heretofore filed by the parties.

Plaintiffs seek their compensation by adopting the lodestar method, which would multiply the total number of hours claimed in this motion (156.51) by the hourly rate charged ($65). That total is $10,173.15.

Paragraph VII of the CONSENT TO JUDGMENT AND DECREE provides that

Plaintiffs shall be awarded their costs, disbursements and attorneys' fees pursuant to 42 U.S.C. § 1988. Attorneys' fees shall be awarded at the rate of $65 per hour for the number of hours (or fraction thereof) found by the court to be reasonable and necessary. There will be no multiplier.

■ Defendants concede that this court has discretion to award reasonable attorneys' fees. They do not challenge the hourly rate asked, but contend that not all of the hours were necessarily and reasonably expended. Although the parties have agreed to the proper hourly rate, I feel compelled to consider the twelve factors recited in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The Ninth Circuit has stated that failure to do so in making a determination of reasonable attorneys' fees constitutes an abuse of discretion. *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied sub nom., Perkins v. Screen Extras Guild, Inc.,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). A combined *Johnson* and lodestar approach is also permissible, using the lodestar analysis as a framework for examining the *Johnson* factors. *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 840 (9th Cir.1982). I use the combined approach here. Thus, I begin by equating the first lodestar element, "hours spent," with the *Johnson* factor of "time and labor required." I then use the various other *Johnson* factors to establish the second lodestar factor, "hourly rate," and to determine whether to augment or increase the overall award of attorneys' fees.

*Id.* at 840–41. *See also Dyke v. Gulf Oil Corporation,* 571 F.Supp. 780 (D.Or.1983).

### A. Time and Labor Required

I find that the number of hours set forth in the motion were reasonably expended. Defendants challenge the necessity of spending 22 hours drafting various documents, including the complaint and a number of motions and affidavits. The preparation of many of these documents required research and in most instances could not be done by adopting a form. I cannot say that attorneys with the skill of plaintiffs' attorneys should have been able to accomplish this task in less than the claimed number of hours.

Defendants' other main objection is to the number of hours spent drafting a motion for summary judgment that was never filed. In addition, plaintiffs expended time in drafting a motion to expedite the filing of the motion for summary judgment, and defendants question the propriety of the expenditure of those hours. Even though plaintiffs' motion to expedite was not granted and they eventually decided not to file the motion for summary judgment, that is not to say that the preparation of those documents and plaintiffs' willingness to file them did not prompt defendants to enter a consent judgment in this case. Much of the time plaintiffs spent was in an attempt to require defendants to comply with an obvious change in federal law and regulations. Plaintiffs chose various methods to bring their point home, and the court does not find that the time expended on those efforts was unreasonable.

### B. Other Johnson Factors

#### 1. The Novelty and Difficulty of the Questions Involved

This is a complex area of the law, involving analysis of the interplay of federal and state requirements. Moreover, the change in the applicable federal law in the midst of litigation presented additional difficulties in both the advocacy of plaintiffs' claim and their participation in negotiations on new

state regulations. This factor favors plaintiffs.

### 2. *Necessary Skill*

Involvement in this case required considerable skill and familiarity with a complicated statutory and regulatory framework. This factor also favors plaintiffs.

### 3. *The Preclusion of Other Employment*

Plaintiffs' attorneys are employees of Legal Aid Service, and I do not find that this factor applies in this case.

### 4. *The Customary Fee*

Plaintiffs request an hourly fee of $65 and that rate has been agreed to by defendants. This is within the range of hourly rates on which fee awards to private attorneys have been based in this district. Legal aid organizations are as entitled to attorneys' fees as are private attorneys. *Oldham v. Ehrlich*, 617 F.2d 163 (8th Cir. 1980).

### 5. *Whether the Fee is Fixed or Contingent*

Again, because plaintiffs' attorneys work for Legal Aid Service, I find this factor is inapplicable here.

### 6. *Time Limitations Imposed by the Client or the Circumstances*

Although counsel had to respond rapidly on occasion, in general this case presented no significant time constraints.

### 7. *The Results Obtained*

Plaintiffs clearly benefitted from the filing and resolution of this suit. Plaintiffs are clearly the prevailing party in light of *Hensley v. Eckerhart*, — U.S. —, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) and they have obtained substantial relief.

### 8. *The Attorneys' Experience, Reputation, and Ability*

Plaintiffs' counsel are experienced in litigating claims in the Medicaid area, as well as those involving other federal entitlement programs. Counsel's experience helped bring this matter to a prompt and reasonable conclusion, and aided plaintiffs in succeeding on their claims.

### 9. *The Undesirability of this Case*

This case was not undesirable and this factor does not apply here.

### 10. *The Nature of the Professional Relationship with the Client*

Although representing a class inevitably presents certain challenges to an attorney, I find that this factor is not significant here.

### 11. *Awards in Similar Cases*

The hourly rate used and the total fee awarded here are comparable with the results in other cases where plaintiffs challenged state practices and laws which were inconsistent with the requirements of federal entitlement programs. *See Gagne v. Maher*, 594 F.2d 336 (2d Cir.1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Lund v. Affleck*, 442 F.Supp. 1109 (D.R.I.1977), *aff'd*, 587 F.2d 75 (1st Cir. 1978). In *Gagne*, the district court disallowed half the hours claimed because the issues "were simple and most attorneys would not have spent so many hours on the case," *Gagne v. Maher*, 455 F.Supp. 1344, 1349 (D.Conn.1978); the Court of Appeals accepted this explanation. *Gagne, supra*, 594 F.2d at 345. Here, as noted previously, there is no need to similarly reduce the fee award.

*Conclusion*

Proposed Or.Admin.R. 461–04–070(6)(e) is inconsistent with 42 U.S.C. § 1396p(c)(2)(B). An applicant's period of ineligibility for Medicaid must be based on the average monthly amount, determined by the state, to which providers of medical care are entitled. I therefore enjoin defendants from using the proposed administrative rule, or any other rule not consistent with this opinion, to determine the period of ineligibility.

In addition, I find that plaintiffs are entitled to their attorneys' fees. They have not sought a multiplier of the lodestar amount. In light of the parties' agreement and my consideration of the various factors relevant to an award of attorneys' fees, I decline to grant such a multiplier. I award plaintiffs the lodestar amount of $10,-173.15.